In the

# United States Court of Appeals

## For the Seventh Circuit

No. 16-1126

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

SHANIN MOSHIRI, also known as
SHAWNI MOSHIRI,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 13 CR 312 — **Matthew F. Kennelly**, *Judge.*

ARGUED DECEMBER 7, 2016 — DECIDED JUNE 5, 2017

Before WOOD, *Chief Judge*, BAUER, *Circuit Judge*, and
SHADID,[*] *District Judge.*

---

[*] Of the United States District Court for the Central District of Illinois,
sitting by designation.

BAUER, *Circuit Judge.* On July 2, 2015, after a bench trial, Doctor Shanin Moshiri was convicted on one count of receiving illegal remuneration in exchange for referring patients to Sacred Heart Hospital in Chicago, Illinois, in violation of 42 U.S.C. § 1320a–7b(b) (Anti-Kickback Statute). On this appeal, Moshiri challenges the sufficiency of the government's evidence and the district court's admission of certain expert testimony. For the following reasons, we affirm the conviction.

## I. BACKGROUND

On March 18, 2014, Moshiri was charged, along with ten other physicians and Sacred Heart administrators, with participating in a scheme by which Sacred Heart paid physicians for referring patients to Sacred Heart under the guise of teaching and personal services contracts. Moshiri requested a severance, waived his right to a jury trial, and proceeded to a bench trial, during which the following facts were established.

Doctor William Noorlag was the director of the podiatry residency program at Sacred Heart from 1999 to 2010. At trial, Noorlag testified that in 2001, Edward Novak, the Hospital's owner and Chief Operating Officer, approached him expressing a desire to bring more podiatry patients to the Hospital. To that end, Novak said that he wanted to begin paying podiatrists pursuant to teaching contracts. It was Noorlag's understanding that the teaching contracts would provide a vehicle to pay physicians for patient referrals. At Novak's direction, Noorlag drafted the language to be used in these contracts.

Between 2001 and 2005, Sacred Heart entered into teaching contracts with podiatrists Richard Weiss, Arshad Khan, and Lewis Carrozza. Each of those contracts contained nearly

identical terms, based on the language Noorlag drafted. They provided that Sacred Heart would pay the physician $2,000 per month for performing duties within the residency program, including teaching, performing administrative tasks, and conducting residency workshops. Noorlag testified that at this time, there were at least six other attending podiatrists who performed teaching duties at the Hospital without receiving any additional pay. He testified that the teaching contracts were unnecessary because physicians had always taught residents without such contracts.

Moshiri's relationship with Sacred Heart began in November 2006, when he signed a teaching contract. He was to receive $2,000 per month for performing duties similar to those required by the contracts with Weiss, Khan, and Carrozza. The contract also provided that Moshiri would serve as the Director of External Podiatric Office Rotations for the residency program. At this time, Carrozza's contract, which was still in effect, provided that he would serve in the same position. According to Noorlag, however, neither Moshiri nor Carrozza were considered to hold that title, and neither performed any of the related duties. Instead, Doctor David Finkelstein held the title of Director of External Rotations, performed the corresponding duties, and did not receive additional compensation from Sacred Heart for that work.

In April 2008, Moshiri signed a new contract with the Hospital, pursuant to which he would receive $4,000 per month for performing the same duties as those set forth in his 2006 contract. After signing this contract, Moshiri was receiving an annual salary of $48,000, while Noorlag, the Director of the Residency Program, was receiving $40,000.

At trial, the government called Doctor Oleg Petrov to offer an expert opinion on the standards for teaching contracts in podiatric residency programs. Petrov was the Chair of the Counsel on Podiatric Medical Education (CPME), which oversees and certifies residency programs throughout the country and publishes standards and requirements for those programs. Petrov testified that he had conducted approximately 60 on–site evaluations of podiatric residency programs during his time with CPME. He testified that teaching stipends are uncommon for attending physicians associated with the residency programs, and that he had never heard of such a physician being paid as much as $2,000 per month. According to Petrov, when physicians received teaching stipends, they were typically between $200 and $4,000 per year, though he acknowledged that payments fluctuated based on geographical area.

According to multiple witnesses, Moshiri did not perform the majority of his duties under the teaching contracts. He had little involvement in the administration of the residency program, did not conduct residency workshops, did not work with residents in the Hospital's clinic, and did not coordinate or supervise the residents' external rotations.

In addition, records showed that Moshiri spent less time teaching and working with residents than many of the other podiatrists associated with the program. The program kept a log of the "didactic activities" physicians performed with residents. Between 2006 and 2013, there were over 1,000 such activities logged, and only nine of those were attributed to Moshiri. During that same time, Moshiri worked with residents on podiatry cases just over three times per month on

average, while eleven other physicians in the program averaged over ten cases per month with residents. The logs also showed that Moshiri logged the lowest number of individual procedures performed by a resident within each of those cases.

Between 2006 and 2013, Moshiri logged more surgeries at Sacred Heart than any other attending podiatrist. During that same period, the Hospital billed Medicare and Medicaid approximately $482,000 for patients Moshiri treated.

In early 2013, law enforcement agents investigating the Hospital secured the cooperation of Anthony Puorro, the Chief Operating Officer. As part of his cooperation, Puorro recorded a number of conversations with Moshiri.

In a conversation recorded on February 18, 2013, Puorro told Moshiri that Novak wanted Moshiri to pick up his check in person. In response, Moshiri suggested that when he came to pick up the check, he could bring a "list of patients" he had referred to the Hospital in case Novak wanted to see it. On February 22, 2013, Moshiri met with Puorro to pick up his check and provided him with a list of the surgeries he performed at Sacred Heart in the previous month.

In another conversation recorded on March 8, 2013, Puorro asked Moshiri if he had another list of patients, to which Moshiri responded, "Not yet." Moshiri asked Puorro if Novak liked the list from last month. He then said that Novak "should be very happy I bring my patients here. This is not the first, uh, stop for me. Okay? … I'm the most active podiatrist in the department of podiatry in this Hospital. … Six, seven patients a month for podiatrist is a lot."

Moshiri was arrested on April 16, 2013. Special Agent Jeffrey Jamrosz informed Moshiri of his *Miranda* rights, and Moshiri agreed to speak with him. Agent Jamrosz testified that Moshiri explained that the meeting with Puorro to pick up his check was atypical, and that he had provided the list of patients to demonstrate what he had done for the Hospital. Agent Jamrosz then testified that he asked Moshiri if the teaching contract was a cover for payments for patient referrals. According to Agent Jamrosz, Moshiri responded that "the contract turned into basically paying for patients."

Moshiri was charged with three counts of receiving illegal payments in violation of the Anti-Kickback Statute. He waived his right to a jury trial and proceeded to a bench trial. On July 2, 2015, the district court found him guilty on one count. The court noted that Moshiri did not function as the Director of External Rotations and that he did not perform most of the duties required by his contract. The court then explained that it relied heavily on Moshiri's recorded statements to Puorro and his statement to Agent Jamrosz. It found that those statements demonstrated that Moshiri understood he was being paid not for teaching, but rather for patient referrals.

Moshiri then filed a motion seeking a judgment of acquittal notwithstanding the verdict or, in the alternative, a new trial. He argued that there was insufficient evidence to establish that he knowingly or willfully violated the Anti-Kickback Statute; that the admission of Petrov's expert testimony was error; and that the statute was unconstitutionally vague as applied in this case. The district court rejected all three arguments and this appeal followed, based on the same challenges.

## II. DISCUSSION

### A.  Sufficiency of the Evidence

Moshiri's first argument on appeal is that there was insufficient evidence to support his conviction. He contends that the government failed to prove that his teaching contracts fell outside the Anti-Kickback Statute's "safe harbor" provision, and that there was insufficient evidence to establish that he knowingly or willfully violated the statute.

When reviewing a challenge to the sufficiency of the evidence, "we view the evidence in the light most favorable to the prosecution and ask whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Salinas*, 763 F.3d 869, 877 (7th Cir. 2014) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). We do not reweigh the evidence nor judge the credibility of witnesses. *United States v. Galati*, 230 F.3d 254, 258 (7th Cir. 2000). If there is a reasonable basis in the record for the verdict, it must stand. *Id.* (citation omitted).

The Anti-Kickback Statute prohibits a physician from knowingly or willfully receiving payment, directly or indirectly, in return for referring a patient for a service for which payment may be made, in whole or in part, under a federal health care program. 42 U.S.C. § 1320a-7b(b)(1)(A). The statute's regulations provide a "safe harbor" for personal services contracts if they meet certain criteria. *See* 42 C.F.R. § 1001.952(d). Generally, a contract is protected by the safe harbor if its terms are for less than a year, the compensation is consistent with fair market values, and the services are reasonably necessary to accomplish the business goals of the

contracting entity. *Id.* If, however, the contract "takes into account the volume or value of any referrals" for services to be paid by a federal health care program, it is not protected. *Id.* § 1001.952(d)(5).

We need only briefly address Moshiri's argument that the government did not prove that his contracts fell outside the safe harbor provision. To clear that hurdle, the government needed to show only that the arrangement "[took] into account the volume or value of any referrals" that Moshiri made to the Hospital. *Id.* There was ample evidence presented to make that showing, beginning with Moshiri's own statements. In February 2013, Moshiri offered to bring a list of his patient referrals to show Novak when he went to pick up his check. In March 2013, Puorro told Moshiri that Novak wanted to see another list of referrals. Moshiri then asked if Novak was happy with the previous list he provided. Additionally, Agent Jamrosz testified that, after his arrest, Moshiri admitted that his relationship with the Hospital had turned into receiving payment for patient referrals. These statements also bolstered the government's evidence showing that Moshiri performed fewer teaching activities than other physicians who were not being paid to teach, and that he did not actually perform the duties associated with the title conferred upon him under the contract. This evidence was sufficient to demonstrate that Moshiri's arrangement with the Hospital took into account his patient referrals, and therefore, fell outside the statute's safe harbor.

For many of the same reasons, Moshiri's next argument also fails. He contends that there was insufficient evidence to prove that he knowingly violated the Anti-Kickback Statute.

Notably, the district court found Moshiri guilty of only one count, which was associated with the check he received on March 8, 2013. There was a sufficient basis in the record for the district court to conclude that, when he accepted that check, Moshiri knew he was being paid, at least in part, for referrals rather than simply for the duties outlined in his contract. Moshiri's conversations with Puorro and his statement to Agent Jamrosz are the most convincing evidence that Moshiri knew he was receiving payment in exchange for referrals. Moshiri's references to the number of patients he brought to the Hospital, his inquiry as to whether Novak was happy with those numbers, and his subsequent admission to Jamrosz indicate that he knew that he was not receiving the March 8, 2013, check only for his teaching.

The government also demonstrated that Moshiri was aware of the Anti-Kickback Statute's prohibitions by introducing a Medicare enrollment form that Moshiri signed in 2012. By signing that document, Moshiri certified that he would comply with all Medicare rules and regulations, including the Anti-Kickback Statute. Additionally, it was clear that Moshiri knew he was not performing all of the duties outlined in his contract, particularly as they relate to his title of Director of External Rotations. When considered in the light most favorable to the government, this illustrates his awareness that he was being paid for something other than performing those duties.

Moshiri argues that the evidence did not make it clear when, if ever, he became aware of the true nature of his contract, and that there was nothing conclusive to show when he stopped "harboring a good fath belief in the lawfulness of his contract." However, his conversations with Puorro, which

occurred on and before March 8, 2013, demonstrate that at some time prior to his receipt of the payment on that date, he was aware that his referral numbers were relevant to his compensation.

In sum, Moshiri's knowledge of the statute's prohibitions, the lack of work performed under the contract, and his statements to Puorro and Agent Jamrosz clearly provided a sufficient basis for the district court to find that Moshiri received the March 8, 2013, payment with the requisite knowledge under the Anti-Kickback Statute. Accordingly, we find that there was sufficient evidence to support Moshiri's conviction.

## B. Admission of Petrov's Expert Opinion Testimony

Moshiri's second argument on appeal is that the district court committed reversible error by allowing Petrov to opine on the fair market value of his contract. He contends that Petrov was not qualified to render such and opinion and that it was not based on sufficient credentials or methodology.

In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), the Supreme Court set forth the framework to be used when determining the admissibility of expert testimony under Federal Rule of Evidence 702. Moshiri does not argue that the district court incorrectly applied the *Daubert* framework. Therefore, we review the district court's admission of Petrov's testimony for an abuse of discretion. *See United States v. Allen*, 269 F.3d 842, 845 (7th Cir. 2001).

Under Rule 702, an expert may offer opinion testimony "if they have 'specialized knowledge,' are qualified based on

'knowledge, skill, experience, training, or education,' and the expert's testimony 'will assist the trier of fact to understand evidence or determine a fact at issue.'" *Id.* (quoting Fed. R. Evid. 702). The district court acts as a "gatekeeper" in determining the relevance and reliability of the opinion testimony, and enjoys "broad latitude" in making such a determination. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999).

Moshiri takes issue with Petrov's testimony that a typical stipend for teaching physicians in podiatric residency programs is between $400 and $2,000 per year and that he had never heard of an attending physician being paid as much for teaching as Moshiri was under his contract. He argues that Petrov was not qualified to give such an opinion, and that his testimony was, therefore, unreliable.

This argument is unavailing. First, it is important to note that, contrary to Moshiri's contention, Petrov did not opine as to the fair market value of Moshiri's contract. The only testimony he provided specifically as to Moshiri's contract was that he had never encountered such high compensation for similar positions. Outside of that, Petrov only testified as to the industry norms for such contracts based on his specialized experience and knowledge within the field.

To demonstrate his qualifications, the government elicited testimony detailing Petrov's extensive background and experience working in the field of podiatric residency. Petrov testified that he had worked for the CPME for over 20 years, during which time he conducted over 60 on–site evaluations of podiatric residency programs. As part of those evaluations, Petrov spoke with administrators regarding compensation for

attending physicians. That background provided a sufficient foundation from which the district court could determine that Petrov was qualified and that his testimony regarding a typical teaching contract was reliable.

Moshiri makes much of the fact that Petrov's testimony was not based on an empirical analysis of podiatric residency programs nationwide, and suggests that without that analysis, Petrov's testimony was unreliable. Such an argument, however, speaks to the weight of his testimony, not its admissibility, and is a matter ripe for cross-examination. *See Gayton v. McCoy*, 593 F.3d 610, 616 (7th Cir. 2010) (noting that even "'shaky' expert testimony may be admissible, assailable by its opponents through cross-examination"). Indeed, on cross-examination, Moshiri elicited testimony that Petrov did not have specific knowledge of the workings of every program in the country, nor the specific details of teaching contracts at Sacred Heart or other Chicago hospitals.

Petrov testified as to the standards within the industry as he had encountered them throughout his considerable personal experience. Such experience, even in the absence of any empirical data, can provide an adequate basis for the admission of expert testimony. *See Metavante Corp. v. Emigrant Sav. Bank*, 619 F.3d 748, 761 (7th Cir. 2010) ("An expert's testimony is not unreliable simply because it is founded on his experience rather than on data … ."). The district court did not abuse its discretion in determining that Petrov was qualified to provide expert testimony on the nature of physician teaching contracts in a podiatric residency program.

**C. Constitutionality of the Anti-Kickback Statute**

Moshiri's final argument on appeal is that the Anti-Kick-back Statute is unconstitutionally vague as applied to his case. He urges us to overturn our holding in *United States v. Borrasi*, 639 F.3d 774, 782 (7th Cir. 2011), that "if part of the payment compensated past referrals or induced future referrals," it constitutes a violation of the Anti-Kickback Statute. He asks us instead to adopt a standard by which a conviction can stand only if the payment for referrals constitutes the "primary purpose" of the arrangement.

We recently rejected an identical argument in *United States v. Nagelvoort*, -- F.3d --, 2017 WL 1959976 at *10 (7th Cir. 2017). For the same reasons set forth in that opinion, we decline to overturn *Borassi*, and hold that the Anti-Kickback Statute is constitutional as applied to Moshiri.

### III. CONCLUSION

For the foregoing reasons, we affirm the conviction.