In the

# United States Court of Appeals

## For the Seventh Circuit

Nos. 15-2933, 16-1496 & 16-3149

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

DESHAUN BROWN, also known as
SQUEAK, KYLE PAGAN and GREGORY
HAWTHORNE,

*Defendants-Appellants.*

Appeals from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 13 CR 772 — **Elaine E. Bucklo**, *Judge.*

ARGUED MAY 18, 2017 — DECIDED JULY 28, 2017

Before BAUER, EASTERBROOK, and SYKES, *Circuit Judges*.

BAUER, *Circuit Judge.*　On September 26, 2013, Deshaun
Brown, Gregory Hawthorne, and Kyle Pagan, along with 21
other defendants, were indicted on federal charges of racke-
teering conspiracy, narcotics offenses, and firearms offenses.

These charges stemmed from the defendants' involvement in an open-air drug market, known as the Keystone Drug Market, located on Keystone Avenue near the intersection of Thomas Street, in Chicago, Illinois. On November 13, 2014, after a seven-day trial, a jury convicted Brown, Hawthorne, and Pagan on conspiracy and narcotics-trafficking charges. All three appealed, each raising different challenges.

## I. BACKGROUND

The street gang known as the Imperial Insane Vice Lords, or the "Double-Is," controlled the Keystone Drug Market. Beginning around 1996, Joseph Faulkner, a high-ranking member of the Double-Is, ran the Keystone Drug Market's operations. Pagan and Hawthorne were also members of the Double-Is, and began selling narcotics for Faulkner in 2000 and 2005, respectively. Brown was a member of a different street gang, known as the Mafia Insane Vice Lords. Despite his different affiliation, Brown purchased narcotics from Faulkner and other members of the Double-Is and sold them on Keystone Avenue beginning in 2007.

In 2011, after Faulkner was arrested, Nathaniel Hoskins, another member of the Double-Is, took over control of the Keystone Drug Market, which he continued to manage until his arrest in 2013. Hawthorne and Pagan continued to sell narcotics on Keystone Avenue under Hoskins. When Hoskins took over, Brown was selling crack cocaine on Keystone Avenue, but was not directly affiliated with the Double-Is' drug trade. Once he took control, however, Hoskins began requiring Brown to pay a tax, either in money or drugs, in

exchange for allowing Brown to sell drugs on Keystone Avenue.

Sometime in late 2010, the Chicago Police Department and the Drug Enforcement Agency began investigating the Double-Is and the Keystone Drug Market. That investigation included various wiretaps and controlled purchases of narcotics, and led to the indictment of 24 individuals on September 26, 2013.

The indictment charged Brown with one count of conspiracy to possess with intent to distribute, and to distribute, heroin, cocaine base, and marijuana, in violation of 21 U.S.C. § 846; and two counts of distributing cocaine base, in violation of 21 U.S.C. § 841(a)(1). The indictment charged Hawthorne with the same count of conspiracy; one count of possessing with intent to distribute heroin, in violation of 21 U.S.C. § 841(a)(1); and one count of being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1). It charged Pagan with the same conspiracy count and four counts of distributing heroin in violation of 21 U.S.C. § 841(a)(1).

Brown pleaded guilty to the distribution charges. Brown, Hawthorne, and Pagan proceeded to trial on the remaining charges. On November 13, 2014, after a seven-day trial, the jury convicted Hawthorne and Pagan of their possession and distribution charges, and convicted all three of the conspiracy charge. The jury did not reach a verdict on Hawthorne's firearm charge. All three filed timely notices of appeal.

## II. DISCUSSION

Brown appeals his conviction, arguing that there was insufficient evidence to sustain the verdict on the conspiracy charge. He also argues that the district court erred in denying two of his requested jury instructions. Hawthorne appeals the district court's denial of his motion for a new trial based on the government's failure to timely disclose information regarding its witness, Charles Vaughn. Pagan appeals his sentence, arguing that the court miscalculated his criminal history level. We address each argument in turn.

### A. Sufficiency of the Evidence as to Brown's Conspiracy Conviction

Brown contends that the government failed to produce sufficient evidence at trial to prove beyond a reasonable doubt that he intentionally joined the drug distribution conspiracy operating at the Keystone Drug Market between 1996 and 2013. "When reviewing a challenge to the sufficiency of the evidence, we view the evidence in the light most favorable to the prosecution and ask whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Moshiri*, 858 F.3d 1077, 1081 (7th Cir. 2017) (citation and quotation marks omitted). We do not make credibility determinations or reweigh the evidence, and "[i]f there is a reasonable basis in the record for the verdict, it must stand." *Id.* (citations omitted). The defendant's burden on a sufficiency challenge is "nearly insurmountable." *United States v. Longstreet*, 567 F.3d 911, 918 (7th Cir. 2009) (citation omitted).

"A conspiracy exists when two or more people agree to commit an unlawful act, and the defendant knowingly and intentionally joins that agreement." *Id.* There must be "substantial evidence that the defendant knew of the illegal objective of the conspiracy and agreed to participate." *Id.* at 918–19 (citation and quotation marks omitted).

We can quickly dispense with Brown's initial and cursory argument that, because he was not a member of the Double-Is, he could not have joined in their narcotics distribution conspiracy. All that is required for a conspiracy conviction is proof that the defendant joined in an agreement to commit an unlawful act, not that he joined in a particular group. *Id.* at 919. Thus, Brown's membership in a different street gang is of no consequence.

Brown does not dispute that he sold drugs on Keystone Avenue, nor does he challenge the existence of the charged conspiracy. His main argument, however, is that the government's evidence proved only that Hoskins forced him to pay a "street tax" in order to sell those drugs, which, he argues, is insufficient to prove his intentional participation in the conspiracy. He contends that his relationship with Hoskins was akin to the type of buyer-seller relationship that we have found insufficient to establish a conspiracy in other cases. *See*, *e.g.*, *United States v. Brown*, 726 F.3d 993, 1001 (7th Cir. 2013) ("People in a buyer-seller relationship have not agreed to advance further distribution of drugs; people in conspiracies have.").

That argument is unavailing, however, because the government's evidence demonstrated a relationship of mutual

financial interest between Brown and Hoskins, unlike a simple buyer-seller relationship. *See United States v. Contreras*, 249 F.3d 595, 600 (7th Cir. 2001) (describing a buyer-seller relationship as one "between dealers who have no interest in the success of each other's enterprise"). There was ample evidence from which the jury could have determined that Brown and Hoskins "agreed to advance further distribution of drugs," and thus, joined in a conspiracy. *Brown*, 726 F.3d at 1001.

Brown and Hoskins made an agreement whereby Hoskins would allow Brown to continue to sell crack cocaine on Keystone Avenue, and Brown would pay Hoskins with either drugs or cash. Brown does not dispute that he agreed to pay Hoskins, nor that he continued to sell narcotics after making the agreement. We have previously held that an agreement to pay rent for the right to sell drugs in a particular area is sufficient to establish a drug conspiracy. *Longstreet*, 567 F.3d at 919–20. This is true whether the participants in the agreement are competitors or acting in concert to sell the same drugs. *Id.* We see no distinction in the agreement here. Brown knowingly agreed to pay Hoskins for the ability to distribute drugs on Keystone Avenue. That agreement demonstrates something more than a simple buyer-seller relationship and, thus, provided a sufficient basis for the jury to convict Brown of conspiracy.

In addition to that agreement, however, the government produced other evidence on which the jury could have relied to reach its verdict. Darrell Pitts, a member of the Double-Is and a cooperating witness, testified that Brown told him that he worked for Faulkner selling heroin at the Keystone Drug Market. Pitts also testified that Pagan told him that Brown and

others were "paid off every pack that gets sold" at the Keystone Drug Market. Pitts' testimony was consistent with the statements Brown made to the officer who arrested him. That officer testified that Brown said that he sold heroin that he received from Faulkner for approximately six months in 2007. Brown also told the officer that, in 2009, he began selling crack cocaine that he received from Charles Vaughn, another member of the Double-Is and a cooperating witness. Brown stated that he always sold these drugs on Keystone Avenue. Finally, Chicago Police officers testified that they twice purchased crack cocaine from Brown while working undercover on Keystone Avenue in June 2011. On both occasions, Brown was working in tandem with one other person to make the exchanges with the officers. All of this evidence, taken together and viewed in the light most favorable to the government, provided a sufficient basis for the jury to conclude that Brown knowingly participated in the charged narcotics conspiracy.

### B. Brown's Proposed Jury Instructions

Brown also challenges the district court's refusal to give two proposed jury instructions. The first related to the proof required for a conspiracy conviction. The second sought to define "street tax," the term Brown used for his arrangement with Hoskins.

A defendant is entitled to an instruction on his theory of defense if: (1) the instruction is a correct statement of the law; (2) the evidence supports the theory of defense; (3) the defense is not part of the government's charge; and (4) the failure to give the instruction would deprive the defendant of a fair trial.

*United States v. Hall*, 608 F.3d 340, 342 (7th Cir. 2010). "Similarly, a district court may refuse a proposed jury instruction if the other instructions convey the same message as the proposed instruction." *United States v. Sinclair*, 74 F.3d 753, 761 (7th Cir. 1993). We review *de novo* the court's refusal to give a proffered instruction. *Hall*, 608 F.3d at 343.

At the close of evidence, the district court gave Seventh Circuit Pattern Jury Instruction 5.10 on membership in a conspiracy. Brown requested that the court give the following additional instruction:

> To prove that a defendant was a member of a conspiracy, the Government must demonstrate a participatory link between the conspiracy and the defendant. Proof of the participatory link requires substantial evidence that the defendant both knew of the conspiracy and that he intended to join and associate himself with the conspiracy's criminal design and purpose. This requires proof the defendant did more than merely know the conspiracy existed, approved of the conspiracy, associated himself with the conspiracy or was present during some conspiratorial activities. In determining whether each defendant became a member of the conspiracy, you may consider only the acts and statements of that particular defendant.

The district court refused to give this instruction, finding that it was duplicative of the Pattern Instruction. We agree. The only material difference between Brown's instruction and

the Pattern Instruction is the use of the phrase "participatory link." The Pattern Instruction adequately conveys the same message, stating that the defendant must have "been aware of the illegal goal of the conspiracy and knowingly joined the conspiracy." *Pattern Criminal Jury Instructions of the Seventh Circuit* (2012 ed.) § 5.10; *see also United States v. Campbell*, 985 F.2d 341, 344–45 (7th Cir. 1993) (explaining that a "participatory link" for purposes of a conspiracy conviction requires evidence that "the defendant knew of the conspiracy and that he intended to join and associate himself with its criminal design and purpose"). The Pattern Instruction accurately stated the government's burden of proof on the conspiracy charge, and Brown's instruction would have been at least repetitive, if not also confusing to the jury.

Brown also requested that the court give the following instruction:

> A "street tax" is a slang phrase describing extortion payments made by victims. A victim of extortion is any person or business forced to make payments under the threat of physical injury, violence or other illegal conduct, to allow them to remain in business. It does not matter that the business the person is engaged in is considered a lawful or unlawful enterprise. Individuals involved in the unlawful business of prostitution, bookmaking, illegal gambling and/or auto theft, have been recognized victims of extortion from organized crime gangs.

The court rejected this instruction, noting that Brown had not produced any evidence to support his reliance on a defense of duress or coercion. We agree. Brown did not argue, and there was no evidence to indicate, that he was forced to sell drugs for Hoskins under the threat of immediate violence. Moreover, his reliance on a defense of duress or coercion would have failed as a matter of law because he was free to reject Hoskins' proposal and simply stop selling drugs on Keystone Avenue. *See United States v. McGee*, 408 F.3d 966, 983 (7th Cir. 2005) (citing *United States v. Bailey*, 444 U.S. 394, 410 (1980)). The instruction is also an incorrect statement of the law to the extent it suggests that the jury could not convict Brown of conspiracy if it found his payments to Hoskins met the definition of a "street tax." As we demonstrated above, the jury was entitled to find that Brown's agreement to pay Hoskins in exchange for the ability to sell drugs was evidence of his participation in the charged conspiracy. *See Longstreet*, 567 F.3d at 919–20.

The proposed instruction is also problematic because it does not provide any guidance for the jury on the potential effect of finding that the arrangement between Hoskins and Brown met this particular definition of "street tax." It simply provides a definition of the term in the context of extortion payments. Accordingly, the court did not err in rejecting Brown's "street tax" instruction.

### C. Hawthorne's Motion for a New Trial on *Brady* Grounds

After the trial concluded, the government sent a letter to all defendants informing them that the prosecutors who tried the

case had just learned of an interview that a cooperating witness in a different case gave to an Assistant United States Attorney in 2009. In that interview, the witness said that he knew that Charles Vaughn had participated in a murder in 2005 and was involved in another gang-related shooting sometime after that. After learning this information, Hawthorne filed a motion for a new trial, arguing that the late disclosure entitled him to a new trial under *Brady v. Maryland*, 373 U.S. 83 (1963). The district court denied the motion, finding that the new information did not create a reasonable probability of a different result in Hawthorne's trial. Hawthorne's only argument on appeal is that the district court erred in denying his motion.

A *Brady* violation exists if the defendant establishes that the government suppressed evidence, which was favorable to the defendant and material to an issue at trial. *United States v. Stallworth*, 656 F.3d 721, 731 (7th Cir. 2011). "Such evidence is material if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Youngblood v. West Virginia*, 547 U.S. 867, 870 (2006) (citation and quotation marks omitted). "We review the denial of a motion for a new trial based upon an alleged *Brady* violation for an abuse of discretion." *Stallworth*, 656 F.3d at 731.

Although the prosecutors assigned to this trial did not know of the interview before trial, the government concedes that the evidence was suppressed because it was in the government's collective knowledge. The district court did not decide whether the evidence was favorable to Hawthorne and instead focused its analysis on materiality. Because we agree with the

district court's conclusion on that issue, we can assume, without deciding, that evidence of a government witness's involvement in a prior murder would have been favorable to Hawthorne for impeachment purposes.

As an initial matter, Hawthorne argues that the district court applied the wrong standard in its *Brady* analysis. He contends that the court incorrectly framed the inquiry by asking whether the undisclosed evidence would have changed the result of the trial, rather than whether there was a reasonable probability of a different result. A review of the record, however, defeats that contention. The court ruled orally on Hawthorne's motion and before providing its analysis, stated the following: "The standard is, as you people noted, would it create a reasonable probability. It would have had to have created a reasonable probability that the result of the proceeding would have been different. … Another way of stating it, does it undermine confidence in the outcome of the trial?" That is an accurate statement of the relevant inquiry in this case. *See Youngblood*, 547 U.S. at 870.

Hawthorne argues, as he did in the district court, that the new evidence was material because it would have caused the jury to question Vaughn's credibility and motives. It is true that *Brady* requires the government to disclose impeachment evidence, *Youngblood*, 547 U.S. at 869, but, we have also recognized that, "ordinarily, newly discovered impeachment evidence will not warrant a new trial under *Brady*" because it will not be considered material, *United States v. Salem*, 578 F.3d 682, 688 (7th Cir. 2009). However, new impeachment evidence

may be material where the government's case rests entirely on one witness's testimony and credibility. *Id.*

That is simply not the case here. Vaughn provided no testimony regarding Hawthorne's possession with intent to distribute charge, which was specific to events that took place on March 6, 2013. As to Hawthorne's involvement in the conspiracy, Vaughn's testimony was minimal. He testified that Faulkner was running the Keystone Drug Market beginning in 1995 or 1996, but also stated that he did not see Hawthorne around the Market at that time. Vaughn testified that Hawthorne became a member of the Double-Is in later years, but also stated that he never personally saw Hawthorne make a drug sale on Keystone Avenue. Finally, he testified that Hawthorne told him about one particular crack cocaine transaction that Hawthorne made with another member of the Double-Is.

Based on the other evidence presented against Hawthorne, it is clear that the government did not rest its case on Vaughn's testimony, such that the new impeachment evidence could be considered material. Darrell Pitts testified that Pagan told him that Pagan and Hawthorne sold heroin for Faulkner while Faulkner was running the Keystone Drug Market. Pitts also testified that he saw Hawthorne making hand-to-hand drugs sales on Keystone on at least five occasions around 2011. A Chicago Police Officer testified that, while undercover in 2008, he purchased heroin from Hawthorne near the intersection of Thomas and Keystone. The Chicago Police detective who interviewed Hawthorne after his arrest in 2013 testified that Hawthorne said that he was a member of the Double-Is and that he began selling heroin for Faulkner in 2000. Hawthorne

also told the officer that Faulkner's operation was selling between ten and twenty "jabs" of heroin per day. In light of that evidence, there is no reasonable probability that the outcome of Hawthorne's trial would differ, even if the jury found that Vaughn lacked credibility. Therefore, the court did not abuse its discretion by finding that the undisclosed evidence was not material.

### D.  Pagan's Sentence

Pagan's only argument on appeal is that the district court miscalculated his criminal history score and, therefore, applied the wrong Guidelines range. The Probation Office's pre-sentence investigation report recommended five criminal history points based on the following calculation: one point for a juvenile conviction of possession of cannabis; one point for possession of an unregistered firearm; one point for a misdemeanor traffic offense; and two points for committing the current offense while under a criminal justice sentence related to the traffic offense. At the sentencing hearing, the district court adopted the PSR's recommendation with the agreement of both parties. That placed Pagan in criminal history category III and, when combined with an offense level of 37, resulted in a Guidelines range of 262 to 327 months' imprisonment.

Pagan did not object to his criminal history calculation in the district court. Both parties contend that Pagan forfeited, rather than waived, this argument. In similar cases, we have held that an objection to a criminal history calculation is forfeited when the defendant failed to raise it below. *See*, *e.g.*, *United States v. Gill*, 824 F.3d 653, 660 (7th Cir. 2016). Therefore, we will treat the argument as forfeited and review for plain

error. *Id.* Under the plain error standard, we will reverse the district court's sentencing determination only where: (1) there is an error; (2) the error is clear or obvious; (3) the error affected the defendant's substantial rights; and (4) the error seriously impugns the fairness, integrity, or public reputation of the proceedings. *Id.* at 661 (citation omitted).

Pagan argues, and the government agrees, that the court should not have assessed criminal history points for his cannabis and traffic offenses. The state court dockets for Pagan's two convictions were obtained after the sentencing hearing. As to the cannabis conviction, the court documents showed that a sentence was never imposed, and therefore, no criminal history points should have been assigned. *See* U.S.S.G. § 4A1.1. As to the traffic conviction, the PSR indicated an 18-month probation term, but the state court documents showed only a 12-month probation term. Because that probation term was not for more than one year, Pagan should not have received a criminal history point for his traffic conviction. *See id.* § 4A1.2(c)(1). Additionally, because he should not have received the criminal history point for the traffic offense, he should not have received the additional two points for committing the instant offense while under a criminal justice sentence. *See id.* § 4A1.1(d).

We conclude that the district court erred in assessing Pagan five criminal history points based on the incorrect information in the PSR. We have consistently held that "[a] district court's adoption of erroneous information in a PSR that results in an incorrect Guidelines range, however correct such information appears, constitutes plain error on review." *United States v.*

*Jenkins*, 772 F.3d 1092, 1098 (7th Cir. 2014) (collecting cases). Accordingly, we find that the court committed plain error here.

### III.  CONCLUSION

For the foregoing reasons, Brown's conviction is affirmed, the district court's order denying Hawthorne's motion for a new trial is affirmed, and Pagan's sentence is vacated and his case is remanded for resentencing.