In the

# United States Court of Appeals

## For the Seventh Circuit

Nos. 16-2208, 16-2676 & 16-3975

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

TOBY JONES, MARIO WHITFIELD, and
KELSEY JONES,

*Defendants-Appellants.*

Appeals from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 14 CR 155 — **Amy J. St. Eve**, *Judge.*

ARGUED MAY 25, 2017 — DECIDED SEPTEMBER 20, 2017

Before WOOD, *Chief Judge,* and BAUER and HAMILTON,
*Circuit Judges.*

BAUER, *Circuit Judge.* In December 2013, a confidential
informant ("CI") informed the Bureau of Alcohol, Tobacco,
Firearms, and Explosives about Defendant Toby Jones, the
leader of a drug-distribution operation on Chicago's West Side.

The CI introduced Toby and his brother, Defendant Kelsey Jones, to ATF Agent Christopher Labno, who posed as a firearms and drug dealer. During several controlled drug purchases, Toby negotiated a drugs-for-guns transaction with Agent Labno. Eventually, Toby instructed one of his drug workers, Wesley Fields, to complete the transaction; Fields was arrested immediately after the exchange. Thereafter, Toby and Kelsey engaged in a week-long effort to track down and kill the CI who arranged the deal, resulting in two separate shootings. In the later shooting, Kelsey fled the scene in a getaway car driven by Defendant Mario Whitfield, whose counsel filed an *Anders* brief that we consider later on.

Toby and Kelsey were later arrested, charged, and convicted of several crimes based on these events. Now, they both raise challenges to those convictions; Kelsey also challenges his sentence. We affirm.

## I. BACKGROUND

### A. Facts

Kelsey was tried by jury, and Toby proceeded to a bench trial. At this joint trial, the government established the following facts, which we view in the light most favorable to the prosecution. *See United States v. Resnick*, 823 F.3d 888, 893 (7th Cir. 2016).

### 1. Kelsey's Role

Kelsey worked for Toby, selling crack cocaine and heroin to customers. He used a cell phone, which Toby provided, to take orders from and make deliveries to customers; he and Fields worked the drug phone in alternating shifts. After

Kelsey completed a drug sale, he brought the money back to Toby. Kelsey also packaged drugs for Toby and provided security to him during drug sales. Particularly, he provided security for Toby and packaged the drugs that were sold to Agent Labno on March 19, 2014. In addition, Kelsey allowed Toby to store drugs in his apartment.

### 2. Drugs-For-Guns Exchange

Between December 2013 and March 2014, the CI and Agent Labno met with Toby six times to purchase crack cocaine with all purchases taking place near the CI's apartment building located at 464 North Austin Boulevard, Oak Park, Illinois. All these meetings were audio and video recorded. At several of these meetings, Toby discussed the purchase of guns.

On January 15, 2014, Toby told Agent Labno that he wanted to purchase a handgun capable of holding 30 rounds of ammunition in the magazine, but not to discuss guns over the phone. On February 4, 2014, Agent Labno showed Toby pictures of guns that he said he had for sale. When shown the picture, Toby specifically asked Agent Labno about the cost of the Glock with an extended magazine and extended clip ("Glock"). Agent Labno responded that he wanted approximately $450 or "six jabs" of crack cocaine. (One jab is a package that typically contains 10 to 12 individual use amounts of crack cocaine or heroin.) Toby responded, "Yeah," and told Agent Labno to bring the Glock to him. He also told Agent Labno that he wanted to purchase the Glock for himself and the Beretta pistol for "somebody else."

On February 26, 2014, the CI and Agent Labno met with Toby to conduct another controlled purchase of crack cocaine.

There, Toby confirmed his intention to purchase the Glock in exchange for crack cocaine. Similarly, Toby, who was accompanied by Kelsey, confirmed that same intention to Agent Labno at a controlled purchase of crack cocaine on March 19, 2014.

On March 25, 2014, Agent Labno and the CI placed a recorded call to Toby. The CI asked Toby if he still wanted to purchase guns from Agent Labno. Toby responded, "Hell yeah I want them." Further, Toby stated, "I just want that [Glock], man." Agent Labno confirmed with Toby that the price was six jabs for the Glock.

On March 26, 2014, Toby sent a text message to Agent Labno, explaining that he was sending Fields to conduct the guns-for-drugs exchange. Agent Labno confirmed that the price was six jabs of crack cocaine for the Glock. Toby responded, "Yep."

Around the same time, Toby called Fields to meet him at Kelsey's apartment to pick up the crack cocaine to pay for the Glock. Toby gave Fields six jabs of crack cocaine and approximately $450 in cash; he instructed Fields to purchase the Glock for him and an additional gun for himself. He further instructed Fields to bring the Glock "straight to him" after purchasing it.

Upon Toby's instruction, Fields then met with Agent Labno and the CI. Agent Labno presented Fields with multiple guns. Fields picked out the Glock for Toby and the Beretta for himself. He was immediately arrested after he gave the crack cocaine and cash to Agent Labno in exchange for the guns.

About an hour after Fields' arrest, the CI called Toby, asking about his payment for arranging the drugs-for-guns transaction. Toby told the CI that Fields had not returned from the drugs-for-guns transaction, and he asked the CI when he had last seen Fields. Toby assured the CI that he would be paid for arranging the deal.

ATF agents placed the CI in a hotel room where he was instructed to stay until Toby was in custody. Despite these instructions, the CI drove back to his apartment. During the drive, the CI received an incoming call from Toby who sounded agitated and repeatedly asked the CI about the CI and Fields' whereabouts. The CI told Toby that he was driving back to his apartment and that he had completed the gun deal with Fields earlier that day, but he did not know Fields' current location. Toby placed a total of 12 outgoing calls to Fields and 15 outgoing calls to the CI in the hours after Fields' arrest. Toby sent Fields a text message, telling him to "Call me let me know you alright."

### 3. Retaliation Conspiracy

On March 27, 2014, shortly after midnight, Kensha Barlow was shot in his apartment located at 464 North Austin Boulevard, Oak Park, Illinois (the CI lived in the same building, but in the unit on the floor below). Barlow heard someone knock on his door and asked who was there. A male voice responded: "It's me … You know who it is, open the fucking door." Barlow looked through the door's peephole, but the person in the hallway covered the peephole with a finger. Once the other person removed his finger from the peephole, Barlow saw two males standing in the hallway; he did not know who

either of the individuals were. Shortly after, Barlow heard shots ring out, and he was shot in the leg. (He later identified Toby as one of these two males.)

Around March 30, 2014, Kelsey called Marty Smith, one of his drug customers, and asked Smith to come to his apartment. Smith and the CI knew each other and lived in the same apartment building. When Smith arrived at Kelsey's apartment, Toby and Kelsey were there. Kelsey questioned Smith about the CI's whereabouts and what kind of car he drove. Smith told Kelsey that he had not seen the CI recently.

On April 2, 2014, the CI's brother ("Mark") and sister-in-law ("Christy") came to Chicago to stay with the CI in his hotel room. Mark, Christy, and the CI drove around the CI's neighborhood. Near the CI's apartment building, the CI saw Kelsey wearing a black-hooded sweatshirt. The CI observed that Kelsey "looked right at" him.

Around 7:24 p.m. that evening, Kelsey called Smith and asked him if there were any cameras in the parking lot outside of the CI's (and Smith's) apartment building. At approximately 8:55 p.m., the CI drove back to his apartment with Mark and Christy. Once the CI parked his vehicle, Kelsey exited a red minivan nearby, approached the CI's vehicle, and fired three shots at the CI. Kelsey fired a fourth shot, which struck through the CI's shoulder and grazed Mark's head.

The CI, Mark, and Christy exited the CI's vehicle and ran in different directions. Christy ran towards the red minivan and saw Whitfield in the driver's seat. Whitfield drove into the alleyway behind the apartment building, picked up Kelsey, and fled the scene with him. Before and after this shooting,

there were many phone calls between Kelsey and Toby, and between Toby and Whitfield.

On April 5, 2014, Kelsey was arrested at his residence. During a search of Kelsey's apartment, agents recovered four dark sweatshirts on Kelsey's bedroom floor. Several of the sweatshirts tested positive for the presence of gunshot residue. Toby was arrested on April 20, 2014.

### B.  Procedural History

On September 17, 2015, Toby and Kelsey were charged in a fifteen-count third superseding indictment. They were both charged with conspiracy to distribute cocaine base, in violation of 21 U.S.C. § 846 (Count 1); distribution of cocaine base, in violation of 21 U.S.C. § 841(a)(1) (Count 7) (based on the March 19, 2014, drug deal); and conspiracy to kill another person with intent to retaliate against an informant, in violation of 18 U.S.C § 1513(f) (Count 10). Toby was charged with additional counts of distributing cocaine base, in violation of 21 U.S.C. § 841(a)(1) (Counts 2 through 8); possession of a firearm in furtherance of a drug crime, in violation of 18 U.S.C. § 924(c) (Count 9) (based on the March 26, 2014, drugs-for-guns exchange); attempt to kill another person with intent to retaliate against an informant, in violation of 18 U.S.C. § 1513(a)(1)(B) (Count 11) (based on the March 27, 2014, shooting of Barlow); and discharging a firearm during a crime of violence, in violation of 18 U.S.C. § 924(c) (Count 12) (same). Kelsey was also charged with violations of § 1513(a)(1)(B) and § 924(c) (Counts 13 and 14, respectively) (based on the April 2, 2014, attempted murder of the CI).

Prior to trial, Toby moved to suppress Barlow's identification of him. The court denied the motion, finding that the agent's identification procedure was not suggestive. Thereafter, Toby pleaded guilty to Counts 1 through 7 and proceeded to a bench trial; the court found him guilty on Counts 8 through 12. Toby moved for a judgment of acquittal or a new trial; the court denied the motion. At sentencing, Toby was sentenced to a total of 40 years' imprisonment. Toby appealed.

Kelsey moved to suppress evidence found at his apartment. After a suppression hearing, the court denied the motion, finding that Kelsey had given oral consent to the search. At trial, Kelsey requested that a buyer-seller instruction be given to the jury. The court denied this request but, in the alternative, proposed that the jury be instructed that Kelsey had obtained drugs for personal use, and that such evidence could not be used to prove the existence of a conspiracy or to prove that he became a member of a conspiracy. Kelsey accepted the court's proposed alternative instruction, but preserved his objection to the denial of his request.

On January 26, 2016, the jury returned guilty verdicts on all counts against Kelsey. Kelsey moved for judgment of acquittal or a new trial. The court denied the motion.

The Probation Office prepared the Presentence Investigation Report, recommending a two-level sentencing enhancement for obstruction of justice based on perjured testimony at the suppression hearing, *see* U.S.S.G. § 3C1.1, and a two-level sentencing enhancement for causing a serious bodily injury to the CI and Mark, *see* U.S.S.G. § 2A2.1(b)(1)(B). Kelsey filed objections to the PSR, arguing that his testimony did not

amount to an obstruction of justice and that the shooting of the CI and Mark did not constitute a serious bodily injury. At sentencing, the court rejected these two objections and sentenced Kelsey to a total of 35 years' imprisonment. Kelsey appealed.

## II. DISCUSSION

### A. Toby's Challenges

Toby raises two main arguments on appeal: first, he argues that there was insufficient evidence to support his conviction for possession of a gun in furtherance of a drug trafficking crime;[1] second, he challenges the district court's denial of his motion to suppress Barlow's eyewitness identification of him.

### 1. Sufficiency of the Evidence

"When reviewing a challenge to the sufficiency of the evidence, we view the evidence in the light most favorable to the prosecution and ask whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Moshiri*, 858 F.3d 1077, 1081 (7th Cir. 2017) (citation and quotation marks omitted). In conducting this evaluation, we neither assess credibility determinations nor reweigh the evidence. *Id.* A defendant who challenges the sufficiency of the evidence against him "faces a

---

[1] Toby also argues that there was insufficient evidence to support his convictions based on his involvement in the Barlow shooting. He contends that the evidence of the shooting stems from unreliable testimony. We decline his invitation to second-guess the trier of fact's credibility determinations.

formidable burden." *United States v. Goree*, 756 F.3d 522, 525 (7th Cir. 2014) (citation omitted).

Section 924(c)(1)(A) prescribes an enhanced penalty for a person who possesses a gun "in furtherance of" a drug trafficking crime. 18 U.S.C. § 924(c)(1)(A). Toby argues that the evidence was insufficient to find that he was in possession of a gun and, even if he had been, the possession was not "in furtherance of" a drug trafficking crime. *See id.*

To establish that Toby possessed a gun, the government relied on a theory of constructive possession. *See United States v. McAnderson*, 914 F.2d 934, 947 (7th Cir. 1990) ("Possession of a firearm may be either actual or constructive."). "Constructive possession is a legal fiction whereby a person is deemed to possess [a gun] even when he does not actually have immediate, physical control of the [gun]." *United States v. Schmitt*, 770 F.3d 524, 534 (7th Cir. 2014) (quoting *United States v. Griffin*, 684 F.3d 691, 695 (7th Cir. 2012)). "Constructive possession may be established by demonstrating that the defendant knowingly had the power and intention to exercise dominion and control over the [gun], either directly or through others, thus establishing a nexus between himself and the [gun]." *United States v. Katz*, 582 F.3d 749, 752 (7th Cir. 2009) (collecting cases).

The government presented sufficient evidence to show that Toby was in constructive possession of a gun. On several occasions, Toby explicitly communicated his intention to acquire the Glock from Agent Labno. The terms of the agreement between Toby and Agent Labno were clear: six jabs of crack cocaine for the Glock. Toby repeatedly confirmed that he wanted to purchase the Glock and agreed to the terms of the

deal, such as the confirmation he gave Agent Labno on March 19 and March 25, 2014.

Toby exercised control over the gun through Fields. As characterized by the district court, Fields was simply Toby's "middleman." Toby informed Agent Labno that he was sending Fields to complete the transaction. Fields testified that Toby gave him six jabs of crack cocaine and $450 on March 26, 2014. He also testified that he was instructed to take the drugs and cash to the transaction with Agent Labno to purchase the Glock and a gun for himself. Toby instructed Fields to bring the Glock to him immediately after the exchange. Moreover, Toby's calls with the CI shortly after Field's arrest demonstrated that Toby expected Fields to bring the Glock to him. Accordingly, the government provided sufficient evidence to establish that Toby constructively possessed a gun.

Since we have concluded that Toby constructively possessed the gun, we now consider whether he possessed the gun "in furtherance of" a drug trafficking crime. *See* 18 U.S.C. § 924(c). We have previously concluded that, "when a defendant receives a gun for drugs, he takes possession of the firearm in a way that furthers, advances, or helps forward the distribution of drugs." *United States v. Doody*, 600 F.3d 752, 755 (7th Cir. 2010) (quotations and brackets omitted). That is what occurred here.

Toby claims that there is insufficient evidence to establish the in-furtherance-of element because Fields exchanged drugs for one gun and cash for the other, and there was insufficient evidence to show which gun was purchased with cash and which with drugs. This argument is unavailing. The evidence,

including the conversations between Toby, Agent Labno, and the CI, makes it clear that Toby intended to purchase the Glock for himself in exchange for six jabs of crack cocaine. We agree with the district court that it does not matter whether Fields was aware of the specifics of the deal. Instead, what matters is that Toby agreed to exchange six jabs of crack cocaine for a Glock.

Toby's constructive possession of the gun, through Fields, was an essential component of the drugs-for-guns transaction. The transaction would not have occurred if it was not for taking possession of the gun. Because Toby, through Fields, received a gun for drugs, the government presented sufficient evidence that he possessed the gun in a way that furthered his distribution of drugs.

### 2. Photo Lineup

Next, Toby challenges the district court's denial of his motion to suppress Barlow's identification of him. We review a district court's denial of a motion to suppress an identification *de novo*, with "due deference to [its] findings of historical fact." *United States v. Sanders*, 708 F.3d 976, 984 (7th Cir. 2013) (citation omitted).

Due process forbids law enforcement from using an "identification procedure that is both suggestive and unnecessary." *Perry v. New Hampshire*, 565 U.S. 228, 239 (2012). Even when such a procedure is used, suppression of the identification is not the inevitable result. *Id.* Suppression follows "only when there is a very substantial likelihood of *irreparable* misidentification … ." *United States v. Johnson*, 745 F.3d 227, 229 (7th Cir. 2014) (citation and quotation marks omitted). To

determine whether a specific identification procedure offends due process, we follow a two-prong approach: (1) we consider whether the defendant has established that the procedure was "both suggestive and unnecessary[;]" and, if so, (2) "we examine the 'totality of the circumstances' to determine whether other indicia of reliability outweigh the corrupting effect of law enforcement suggestion." *Sanders*, 708 F.3d at 983–984 (citations, alterations, and quotation marks omitted).

During the suppression hearing, five witnesses were called to testify, and the parties stipulated to the testimony of two other witnesses. According to the testimony presented, Barlow went to the Oak Park Police Station and met with Detective Robert Taylor on April 2, 2014. Detective Taylor testified that he assembled two color photo lineups based on information he obtained from the ATF. He also testified that, when he showed Barlow the lineup, Barlow paused over Toby's arrest photo twice. Barlow's testimony corroborated that he paused at Toby's photo because he recognized him as the shooter. According to Barlow, he denied any recognition because he did not want to get involved and feared for his safety.

The evidence at the suppression hearing also established that Barlow was arrested for drug activity unrelated to this case and was interviewed by Agent Labno on June 2, 2014. At the ATF offices, Barlow told the agents that he viewed a photo lineup at the Oak Park Police Station on March 28, 2014, and stated that his shooter was depicted in that lineup. Agent Labno printed large scale pictures of each of the six individuals in the photo lineup, intending to display the photos for Barlow in the same order as the previous lineup.

When Agent Labno entered the room where Barlow was sitting, he held the six photos in the order of the previous lineup. However, the top three photos were more prominent than the other photos in the stack. Toby's arrest photo was the third photo from the top and just as visible to Barlow as the top two photos. Before Agent Labno had the opportunity to place the individual photos on the table, Barlow identified his shooter as the person in Toby's arrest photo. Agent Labno realized that the identification was not ideal, so he placed the photos on the table in the same order as the previous photo lineup as he initially intended to do. Barlow identified Toby again. Agent Labno then printed off a black and white copy of the photo lineup that Detective Taylor had shown him; Barlow again identified Toby.

First, Toby claims that the identification procedure was unduly suggestive because Agent Labno showed Barlow the same arrest photo of Toby that was contained in the array first administered by Detective Taylor. We disagree. As an initial matter, "there is nothing per se impermissible about placing the same suspect in two different identification procedures." *United States v. Griffin*, 493 F.3d 856, 865 (7th Cir. 2007) (citation omitted). The "danger to be avoided in identification procedures is that of *orchestrating* the procedure so that … the procedure implicitly suggests to the witness that 'this is the man.'" *Gregory-Bey v. Hanks*, 332 F.3d 1036, 1045 (7th Cir. 2003). Here, Toby's argument ignores the fact that, in both identification procedures, Barlow was shown not only the same arrest photo of Toby, but the same arrest photo of five other individuals. Given that the six photos were the same in both identification procedures, we do not see how Toby can seriously claim

that the use of the same arrest photo implicitly suggested that he was the shooter.

Second, Toby argues that the officers failed to use best practices when conducting the identification procedures. Toby observes that we have previously suggested that an officer should show photos sequentially rather than as part of an array. *See United States v. Ford*, 683 F.3d 761 (7th Cir. 2012). However, we have noted that "some recent research has called into question the view that sequential presentation of photographs is superior to photo spreads." *Johnson*, 745 F.3d at 228. Because Toby does not address *Johnson*, we find his argument unpersuasive. Toby's other "best practices" challenges are undeveloped or have been addressed in *Johnson*.

Third, Toby contends that it was unduly suggestive for Agent Labno to display Toby's photo on top of the stack of photos. As the government notes, this is a mischaracterization of the record. The record shows that Agent Labno walked into the room where Barlow was waiting with six individual photos in his hand, while the top three were more prominent than the others. Toby's photo was included in the three photos that were more prominent, but it was no more prominently displayed than the other two more prominent photos. More-over, Toby's photo, like the other two, was previously viewed at the initial identification procedure.

Lastly, Toby argues that the two months elapsed time between the identifications made it unduly suggestive. We disagree. We have previously held that two months between identification procedures mitigated the suggestiveness of an identification procedure. *Griffin*, 493 F.3d at 865–866; *see also*

*Sanders*, 708 F.3d at 989 (collecting cases). We conclude that the identification procedure was not unduly suggestive.

### B. Kelsey's Challenges

Kelsey challenges the sufficiency of the evidence to sustain his convictions on several counts. He also argues that the district court erred in its application of two sentencing enhancements.

### 1. Sufficiency of the Evidence

Kelsey contends that the government presented insufficient evidence to sustain his convictions on Count 10, Count 13, and Count 14. Specifically, he argues that there was insufficient evidence to prove that he shot the CI on April 2, 2014, and that he had the retaliatory intent as required for Count 10 and Count 13.

A defendant is guilty of retaliating against a witness if he attempts to kill a person with intent to retaliate against that person for "providing to a law enforcement officer any information relating to the commission or possible commission of a Federal offense … ." 18 U.S.C. § 1513(a)(1)(B). Section 1513(f) makes it a crime to conspire to commit the offense of retaliation. Section 924(c)(1)(A)(iii) prescribes an enhanced penalty for anyone who discharges a firearm "during and in relation to" any crime of violence.

Here, the government presented sufficient evidence to establish that Kelsey was the person who shot the CI on April 2, 2014. The CI and Mark testified that they got a clear view of Kelsey's face on the day that they were shot and they both identified him in court as the person who shot them.

Kelsey simply challenges those witnesses' credibility, noting Mark's drug use and inconsistencies with the CI's initial description of the person who shot him. These concerns were addressed at trial, and the jury still determined that Kelsey was the shooter.

The government also provided sufficient evidence to establish Kelsey's intent to retaliate against the CI for providing information to law enforcement. The evidence illustrated that Kelsey and Toby knew the CI before he was shot on April 2, 2014. The CI introduced Agent Labno to Toby to help arrange the drugs-for-guns transaction. Toby made repeated attempts to contact the CI and ultimately blamed the CI for the set up.

Smith, the CI's neighbor, testified that Kelsey inquired about the CI's location and car, and asked him to report back if he saw the CI. Smith also testified that on the evening of April 2, 2014, Kelsey called him to ask whether there were any cameras in the parking lot of the apartment building where the CI lived.

Barlow and the CI resided at the same address; Barlow was shot on March 27, 2014, and the CI was shot on April 2, 2014. The evidence established that Toby mistakenly shot Barlow at his apartment because he thought the CI lived there. After realizing his mistake, Kelsey went back to the building on April 2, 2014, and shot the CI. A jury could have reasonably inferred that Toby and Kelsey wanted to kill the CI in retaliation for the CI's cooperation with law enforcement, which resulted in Fields' arrest and a foiled drugs-for-guns transaction.

Next, Kelsey argues that there was insufficient evidence to support his drug-conspiracy conviction, *see* 21 U.S.C. § 846. We decline his invitation to "second-guess the jury's credibility determinations." *United States v. Cardena*, 842 F.3d 959, 994 (7th Cir. 2016). We have already detailed Kelsey's role in the conspiracy. We conclude that the government's evidence was sufficient. Relatedly, we note that Kelsey also challenges the court's denial of his request for a buyer-seller jury instruction. *See United States v. Lomax*, 816 F.3d 468, 476 (7th Cir. 2016). His argument lacks merit, especially in light of all the evidence the government presented and the court's alternative instruction.

### 2.  Sentencing Enhancements

Kelsey challenges the two-level obstruction of justice enhancement under U.S.S.G. § 3C1.1. We review a district court's factual findings underlying this enhancement for clear error, and we review *de novo* whether these findings adequately support the enhancement. *United States v. Nichols*, 847 F.3d 851, 858 (7th Cir. 2017).

The Guidelines permit a two-level upward adjustment if a defendant "willfully obstructed or impeded, or attempted to obstruct or impede" the prosecution of the offense of conviction. U.S.S.G. § 3C1.1. In applying this enhancement based on perjury, the district court should indicate it has found the elements of perjury: falsity, materiality, and willfulness. *United States v. Brown*, 843 F.3d 738, 742 (7th Cir. 2016) (citation omitted).

Kelsey argues that the false testimony he provided at the suppression hearing was not willful. He claims that he testified to the best of his ability as to his interactions with law enforce-

ment agents on April 5, 2014. He argues that his testimony at the suppression hearing was along the lines of simply not being able to recall being shown a consent-to-search form and that he never gave oral consent to the search.

We disagree. The district court found that Kelsey gave more than just misstatements but "intentionally false responses that were made in an effort to get the evidence suppressed." The court referenced its findings from its order denying Kelsey's suppression motion, which detailed his internally inconsistent testimony. For example, Kelsey submitted an affidavit in which he denied giving the agents oral consent to search his apartment and represented that he refused to sign a consent-to-search form. In contrast, he testified that Agent Labno never showed him a document and that he never saw a consent-to-search form. But this was not the end of the contradictions. On cross-examination, Kelsey testified that he did not recall having a conversation with Agent Labno about consent to search his apartment. Contrary to this claim, he testified that Agent Labno asked him to sign a consent-to-search form and that he told Agent Labno that "there's nothing in my apartment. I'm not signing no consent." The district court found that Kelsey's testimony was contradictory, evasive, and not credible. Accordingly, the district court properly applied the enhancement for obstruction of justice under § 3C1.1.[2]

---

[2] In light of this discussion, we note that Kelsey also challenges the denial of his suppression motion, arguing that the district court erred in finding that he gave consent to the search of his apartment. It is well established that a search conducted pursuant to voluntary consent from the person

(continued...)

Next, Kelsey contends that there was insufficient evidence to support the two-level enhancement under U.S.S.G. § 2A2.1(b)(1)(B). He also argues that the injuries the CI and Mark suffered did not constitute a "serious bodily injury." Because Kelsey argues that the district court misinterpreted the Guidelines, our review is *de novo*. *United States v. Bogan*, 267 F.3d 614, 624 (7th Cir. 2001). We review for clear error a district court's factual findings at sentencing. *Id.* at 623.

The Guidelines permit a two-level sentencing enhancement when a victim sustains a "serious bodily injury" in the course of an attempted murder. U.S.S.G. § 2A2.1(b)(1)(B). A serious bodily injury is as an "injury involving extreme physical pain or the protracted impairment of a function of a bodily member, organ, or mental faculty; or requiring medical intervention such as surgery, hospitalization, or physical rehabilitation." U.S.S.G. § 1B1.1, cmt. n.1(L).

The district court applied the enhancement based on injuries that the CI and Mark suffered as a result of Kelsey shooting them. First, the court credited the CI's testimony that Kelsey shot him "point-blank" in the back of his left shoulder and the bullet hit his jaw as it exited. The court further noted

---

[2] (...continued)

whose property is searched is not a violation of the Fourth Amendment. *See Georgia v. Randolph*, 547 U.S. 103, 109 (2006). "Whether consent was given is a factual issue that we review for clear error." *United States v. Gonzalez-Ruiz*, 794 F.3d 832, 835 (7th Cir. 2015). Kelsey fails to show that the court committed clear error in finding that he gave consent or that its decision to credit the agent's testimony over his own was "completely without foundation." *Id.* The court properly denied Kelsey's motion.

that the CI had to go to the hospital and that he was in physical pain. Second, the court also credited Mark's testimony that he had to go to the hospital to have his head stapled after the bullet lacerated his scalp. Mark described his extreme physical pain, testifying that, on a level from one to ten, his pain was a ten.

Kelsey denies that the two victims suffered a serious bodily injury because they were released from the hospital within hours of arriving. In *Bogan*, we rejected the argument that a serious bodily injury necessarily requires a prolonged hospital stay. 267 F.3d at 624. Hospitalization is only one aspect of what may be considered in determining whether a victim's injury constitutes a serious bodily injury. *See* U.S.S.G. § 1B1.1, cmt. n.1(L). The court considered the victim's extreme physical pain, not hospitalization.

The question here is whether the government proved by a preponderance of the evidence that the CI or Mark suffered a serious bodily injury. The district court observed the CI's and Mark's testimony and photographs presented at trial. The court had an adequate basis to support its finding as to the nature of the injuries.

C. *Anders* **Brief**

Last, we address the *Anders* brief submitted by counsel for Whitfield. Whitfield waived his right to a jury trial and proceeded to a bench trial. He was convicted of being an accessory after the fact, in violation of 18 U.S.C. § 3. The district court denied his renewed motion for a judgment of acquittal or a new trial. Prior to sentencing, Whitfield objected to the presentence investigation report. At sentencing, the district

court rejected Whitfield's objections to the PSR and sentenced him to 84 months' imprisonment.

Whitfield's attorney filed an *Anders* brief in support of his motion to withdraw as appointed counsel. We agree with counsel that it would be frivolous to challenge the denial of Whitfield's motion for acquittal or a new trial, the district court's evidentiary determinations, or the denial of his request for new appointed counsel.

We also agree with counsel that it would be frivolous to challenge the sentence; the district court stated that it would have imposed the same sentence even if it was incorrect about the sentencing enhancement; the district court departed from the Guidelines based on strong evidence that Whitfield was the getaway driver for the April 2, 2014, shooting of the CI.

Finally, we also note that Whitfield made further arguments in his response to the *Anders* brief that are without merit. We therefore grant counsel's motion to withdraw and dismiss Whitfield's appeal.

### III.  CONCLUSION

For the reasons mentioned above, we AFFIRM Toby Jones' conviction and Kelsey Jones' conviction and sentence. We GRANT Whitfield's counsel's motion to withdraw and DISMISS Whitfield's appeal.