In the

# United States Court of Appeals

## For the Seventh Circuit

No. 15-2057

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

RICHARD J. KLEMIS,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Southern District of Illinois.
No. 11-CR-30108 — **David R. Herndon**, *Judge*.

ARGUED APRIL 7, 2016 — DECIDED JUNE 12, 2017

Before EASTERBROOK, KANNE, and SYKES, *Circuit Judges*.

SYKES, *Circuit Judge*. Richard Klemis was in the business of selling heroin in O'Fallon and Belleville, Illinois, two suburban communities in the Metro East area of greater St. Louis. His customer base included teenagers and 18- to 21-year-olds. One of his young customers overdosed on heroin in Klemis's driveway and nearly died; timely medical intervention saved his life. Nineteen-year-old Tyler McKinney was not so lucky. A regular customer and occa-

sional driver for Klemis, McKinney fatally overdosed on heroin supplied by Klemis.

Klemis was indicted on multiple drug charges, including conspiracy to distribute heroin, distribution of heroin to persons under 21, using a minor in a drug operation, and heroin distribution resulting in serious physical injury or death. A jury convicted him on all counts, and the judge imposed a lengthy prison term.

Klemis's main claim on appeal is that the prosecutor made a number of improper and inflammatory statements during closing argument, including a vivid rhetorical flourish assigning Klemis to the innermost circle of hell depicted in Dante's *Inferno*. This form of argumentation indeed crossed the line, but it was not prejudicial given the quantity and quality of the evidence against Klemis; the rest of the prosecutor's closing argument was well within bounds. Klemis's remaining claims include a challenge to the sufficiency of the evidence on the count relating to McKinney's death, an argument about hearsay evidence, and a complaint about juror bias. We find no error and affirm.

## I. Background

Klemis ran his drug business out of his home in O'Fallon where he lived with his mother and teenage half-brother Justin Lewis. Justin introduced Klemis to his high-school friends, and Klemis began supplying them with marijuana and eventually heroin. It was only a matter of time before things turned tragic. In 2010 Eric Schulze went to Klemis's house to buy heroin and then overdosed in the driveway; quick medical intervention saved his life. In 2011 Tyler McKinney, age 19, fatally overdosed on heroin supplied by

Klemis. McKinney had been one of Klemis's most frequent heroin customers and sometimes earned his drugs by driving Klemis from O'Fallon to St. Louis to purchase heroin for resale.

Klemis was charged with nine federal crimes related to heroin trafficking and his role in Schulze's overdose and McKinney's death: conspiracy to distribute heroin, 21 U.S.C. §§ 841(a)(1), 846; four counts of distribution of heroin to a person under 21, *id.* § 859; use of a person under 18 years of age in a drug operation, *id.* §§ 841(a)(1), 861(a)(1) and (b); distribution of heroin resulting in death, *id.* § 841(a)(1), (b)(1)(C); distribution of heroin resulting in serious physical injury, *id.* § 841(a)(1), (b)(1)(C); and possession of heroin, *id.* § 844(a). The charges were tried to a jury over seven days.

The government's evidence was abundant and powerful. Prosecutors presented testimony and documentary evidence from several law-enforcement officers and paramedics, as well as medical witnesses, who testified about the facts of Schulze's overdose and McKinney's death. Christopher Gonzales, Klemis's coconspirator, was a witness for the prosecution and provided details about their heroin-trafficking activities. Among other things, Gonzales told the jury that Klemis sometimes stayed with him at his home in Belleville and together they sold heroin from that house. The two often pooled their money to buy heroin, and Gonzales also drove Klemis to St. Louis to purchase heroin from Klemis's supplier. Gonzales testified that he did not himself sell heroin to teenagers. But he was aware that Klemis was doing so and testified that he told him not to.

The government also presented testimony from many of Klemis's young heroin customers and their friends. These

witnesses included Alexis J. Carmack, who was 19 years old when Klemis sold her heroin; Corey Keys, who was 20 when Klemis sold him heroin; and Nicholas Ramage, who was 16 when he bought heroin from Klemis. Ramage also testified that he helped Klemis purchase heroin and watched him prepare it for resale.

The evidence connecting Klemis to McKinney's death was especially strong. Seven witnesses testified that McKinney earned his heroin by driving Klemis to St. Louis to meet with his supplier. Eight witnesses testified that they had seen Klemis sell heroin to McKinney or inject McKinney with heroin or both. One of these witnesses, Alexis Carmack, dated McKinney for a time in 2010; she testified that Klemis injected McKinney with heroin "every time we were with each other, so quite a few, nine or ten or more." Nicole Feyearbend also dated McKinney on and off during this period. She testified that she saw Klemis inject McKinney with heroin "four or five times" and that the last time she saw this was the week before McKinney died. Nancy Singleton and Garrett Libbra both testified that McKinney told them that he needed money to pay his drug debt to Klemis. Singleton testified that McKinney stole some jewelry from her and told her he did it because he was "afraid something would happen to him if he couldn't pay [Klemis] back." Libbra testified that McKinney had asked him for $400 to $500 to pay off his drug debt to Klemis.

Six witnesses testified that Klemis admitted to them that he had supplied the heroin that killed McKinney. A text-message conversation between McKinney and Klemis on the day McKinney died showed that McKinney received a package of heroin from Klemis about an hour before his

death. The government's case also included phone and text logs tracing the phone calls and text messages Klemis and McKinney exchanged to arrange the heroin transaction that day. Finally, Dr. Christopher Long, the government's expert toxicologist, testified that McKinney died of a heroin overdose.

Two final points about Klemis's trial are relevant here. During jury selection, Juror 28 said that her brother had wrestled with drug addiction since he was a teenager. In response to follow-up questioning from the judge, she explained that "[o]bviously I'd want to be sympathetic to any family for the loss of — you know, but at the same time, I can separate emotions." She ultimately assured the court that she could be fair to both sides. Juror 28 was seated on the jury without objection.

Finally, in closing argument the prosecutor referred at some length to Dante's *Inferno* and its depiction of the inhabitants of the nine circles of hell. The prosecutor assigned Klemis to the innermost circle reserved for the worst of the damned. The prosecutor also told the jury that "heroin kills" and described the witness Nancy Singleton as a "straight citizen" and "not an addict."

The jury convicted Klemis on all counts. The judge imposed concurrent sentences of 240 months in prison on each of the eight felony counts and a concurrent term of 12 months on the misdemeanor possession count.

## II. Discussion

Klemis raises four issues for review. First, he contends that the parts of the prosecutor's closing argument we've described above amounted to prosecutorial misconduct in

violation of his right to a fair trial. Second, he challenges the sufficiency of the evidence on count 2, the distribution count pertaining to McKinney's death. His third argument is that Libbra and Singleton should not have been permitted to testify about McKinney's statements to them about needing money to pay Klemis for drugs. Finally, he claims that Juror 28 was irretrievably biased and her presence on the jury deprived him of a fair trial. Most of these claims were forfeited; none warrants reversal.

## A. Prosecutorial Misconduct

Klemis challenges three aspects of the prosecutor's closing argument: (1) his discussion of Dante's *Inferno*; (2) his statement that "heroin kills"; and (3) his description of Nancy Singleton as a "straight citizen" and "not an addict." Klemis did not object to any of these statements, so our review is for plain error. Reversal is warranted only if we find an obvious (i.e., "plain") error that affected the outcome of the trial and seriously affected the fairness, integrity, or public reputation of the judicial proceedings. *Puckett v. United States*, 556 U.S. 129, 135 (2009); *see also* FED. R. CRIM. P. 52(b). The challenged remarks cannot be plain error unless Klemis probably would have been acquitted if the prosecutor had not made them. *United States v. Della Rose*, 403 F.3d 891, 906 (7th Cir. 2005).

As a general matter, a misconduct claim of this type turns on whether the prosecutor's remarks were both improper and "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986). Our task is to determine whether the remarks were improper, and if they were, to assess whether the remarks deprived the defendant of a fair

trial when viewed in context of the trial as a whole. *United States v. Wolfe*, 701 F.3d 1206, 1211 (7th Cir. 2012). To guide the analysis, the Supreme Court has directed us to evaluate five factors: (1) the nature and seriousness of the alleged misconduct; (2) whether the defense invited the prosecutor's statements; (3) whether the jury instructions adequately addressed the matter; (4) whether the defense had an opportunity to respond to the improper remarks; and (5) the weight of the evidence against the defendant. *Darden*, 477 U.S. at 181–82. A challenge of this kind is an uphill battle; "improper statements during closing arguments rarely constitute reversible error." *Wolfe,* 701 F.3d at 1211.

Klemis focuses primarily on the prosecutor's discussion of the nine circles of hell depicted in Dante's *Inferno* and his assignment of Klemis to the innermost circle reserved for the worst of the damned:

> If dealing dope was graded the way Dante did hell, as nine concentric circles, among all dope dealers, where would we place Richard Klemis? … [A]n adult who sold marijuana to other adults would be on the outermost circle … , that might be the least serious form of dope dealing. What would be the next circle, as we go closer and closer to the center of evil? … Well, how about selling heroin to adults? Now, why would selling heroin to adults be moving closer and closer to the center of evil? Because heroin kills. …

> Now, what could be worse than selling the most dangerous powerful drug on earth to other consenting adults? Could we find any-

> thing that would be worse than that? Yes. Yes, we can. How about selling the most dangerous drug on earth to kids? I mean, that's just unspeakably evil and that's what Richard Klemis did. …

> And for that, ladies and gentlemen, I think in the nine circles I'm describing, that describe the universe of drug dealers, Richard Klemis goes into the first circle. … So, I have already said that I would assign Richard Klemis to the inner circle of evil because he sold heroin to children.

This rhetorical device was a naked appeal to passion rather than reason and evidence and as such falls outside the bounds of proper closing argument. Still, on this record the improper remarks made no difference to the outcome. It's exceedingly improbable that Klemis would have been acquitted had the prosecutor kept his Dante musings to himself. *See United States v. Johnson*, 655 F.3d 594, 602 (7th Cir. 2011).

The *Darden* factors tilt heavily in the government's favor. The prosecutor's remarks were certainly improper, and they were not invited by defense counsel, but the remaining factors convincingly establish that the misconduct caused no harm. The judge adequately instructed the jurors that the arguments of counsel are not evidence, reminding them multiple times that "[t]he evidence includes only what the witnesses say when they are testifying under oath, the exhibits that I allow into evidence, and any facts to which the parties stipulate. Nothing else is evidence." Klemis's counsel had ample opportunity to object or otherwise re-

spond; his decision to let it pass without objection may well have been strategic.

In the final analysis, "the most important of the *Darden* factors is the weight of the evidence against the defendant." *Howard v. Gramley*, 225 F.3d 784, 793 (7th Cir. 2000). As we've noted, the evidence of Klemis's guilt was plentiful and compelling. Multiple witnesses described Klemis's heroin trafficking in substantial detail. On the count relating to McKinney's death in particular, the government introduced text and phone records documenting that Klemis provided heroin to McKinney just before he fatally overdosed, and several witnesses testified that Klemis acknowledged his responsibility for selling McKinney the heroin that killed him. The *Inferno* remarks, though improper, did not affect the fairness of the trial.

Klemis also challenges the prosecutor's statements that "heroin kills" and "anytime someone uses heroin, injecting it, their life is automatically in danger. You cannot tell what's in the needle; you don't know how pure it is, how concentrated it is." Again Klemis did not object in the district court; he now argues that these statements amounted to improper commentary on facts not in evidence. *See United States v. Henry*, 2 F.3d 792, 795 (7th Cir. 1993) ("It is fundamental that counsel cannot rely or comment on facts not in evidence during closing argument."). Not so. These statements simply encapsulate reasonable and commonsense inferences that arise from the uncontroverted evidence—particularly Dr. Long's description of how heroin affects the body. We find no error.

Finally, Klemis attacks the prosecutor's reference to Nancy Singleton as "a straight citizen" and "not an addict."

Once again, Klemis did not object to these statements; he now contends that they amount to improper vouching for the witness.

We have recognized two types of improper vouching: "[A] prosecutor may not express her personal belief in the truthfulness of a witness, and a prosecutor may not imply that facts not before the jury lend a witness credibility." *Wolfe*, 701 F.3d at 1212 (quotation marks omitted). But a prosecutor may properly comment on a witness's credibility if "the comment reflects reasonable inferences from the evidence adduced at trial rather than personal opinion." *Id.* (quotation marks omitted). The challenged statements are of the latter, permissible type. According to her own unrebutted testimony, Singleton was not a drug user (in contrast to some of the government's other witnesses). The prosecutor's statements simply restated the undisputed evidence in slightly different terms.

## B. Distribution of Heroin Causing McKinney's Death

Klemis next argues that the evidence was insufficient to support his conviction for distributing heroin to McKinney causing his death. The judge denied his motion for acquittal on this count; we review that decision de novo. *United States v. Moses*, 513 F.3d 727, 733 (7th Cir. 2008). But Klemis's argument has notably shifted on appeal. In the district court, he maintained that the evidence didn't establish that it was *his* heroin that killed McKinney. He now argues that the government didn't prove that *heroin* caused McKinney's death because the medical evidence established that the cause of death was technically acute *morphine* intoxication. This argument—even if it had been adequately preserved— is frivolous. Dr. Christopher Long, the government's toxicol-

ogist, and Dr. Raj Nanduri, who performed the autopsy, both testified that heroin is an opiate that metabolizes into morphine.

## C. Confrontation Clause and Hearsay Objections

Klemis argues that Singleton and Libbra should not have been permitted to testify about certain statements McKinney made to them in the weeks before he died. Recall that Singleton testified that McKinney stole jewelry from her and told her that he did so because he was "afraid something would happen to him if he couldn't pay [Klemis] back." Libbra testified that McKinney asked to borrow $400 or $500 because he owed Klemis money for drugs. Klemis claims that this testimony was impermissible on two grounds: it was inadmissible hearsay, and it violated his Sixth Amendment right of confrontation.

The constitutional argument was forfeited, so again our review is circumscribed by the plain-error standard. The Sixth Amendment's Confrontation Clause prohibits the introduction of testimonial statements by a nontestifying witness unless the witness is "unavailable to testify[] and the defendant had had a prior opportunity for cross-examination." *Crawford v. Washington*, 541 U.S. 36, 54 (2004). In *Ohio v. Clark*, 135 S. Ct. 2173 (2015), the Supreme Court clarified the scope of its ruling in *Crawford*: "[A] statement cannot fall within the Confrontation Clause unless its primary purpose was testimonial. Where no such primary purpose exists, the admissibility of a statement is the concern of state and federal rules of evidence, not the Confrontation Clause." *Id.* at 2180 (internal quotation marks omitted). Elaborating, the Court explained in *Clark* that statements made to persons who are not law-enforcement personnel are "much less

likely to be testimonial than statements to law enforcement officers." *Id.* at 2181. The Court instructed us to consider the context of the challenged statements, keeping in mind that "[s]tatements made to someone who is not principally charged with uncovering and prosecuting criminal behavior are significantly less likely to be testimonial than statements given to law enforcement officers." *Id.* at 2182. The key is "whether a statement was given with the primary purpose of creating an out-of-court substitute for trial testimony." *Id.* at 2183 (internal quotation marks omitted).

On this understanding of the Confrontation Clause right, there was no error here, plain or otherwise. McKinney's statements to Singleton and Libbra reflect spontaneous attempts to borrow or steal from friends to pay a drug debt, not efforts to create an out-of-court substitute for trial testimony.

We see no error under the Federal Rules of Evidence either. The judge applied Rule 804(b)(3), which allows the admission of an unavailable declarant's statement against his own interest if the statement is supported by "corroborating circumstances that clearly indicate its trustworthiness." FED. R. EVID. 804(b)(3). A statement against interest includes "one that tends to expose the declarant to criminal liability." *Id.* Klemis sought unsuccessfully to block the admission of this testimony under Rule 803(b)(3), so this argument was adequately preserved. We review the judge's ruling for abuse of discretion. *United States v. Perkins*, 548 F.3d 510, 513 (7th Cir. 2008).

The judge was right to admit this testimony. The three requirements for admissibility under Rule 803(b)(3) are easily satisfied. McKinney was obviously unavailable, and

his statements to Libbra and Singleton—saying that he needed to borrow or steal to pay a drug debt to Klemis— were clearly against his penal interest. And substantial corroborating evidence supports their trustworthiness. Multiple witnesses testified that Klemis was McKinney's heroin supplier.

Klemis raises a new objection on appeal, arguing that McKinney's statements should have been excluded under Rule 403 as unfairly prejudicial. As with other forfeited arguments, "unpreserved evidentiary issues must be analyzed under a plain error standard." *United States v. Ramirez-Fuentes*, 703 F.3d 1038, 1042 (7th Cir. 2013). A forfeited Rule 403 argument rarely results in reversal because the defendant "must show that the evidence was so obviously and egregiously prejudicial that the trial court should have excluded it even without any request from the defense." *United States v. Collins*, 604 F.3d 481, 487 (7th Cir. 2010) (internal quotation marks omitted).

Klemis has not carried his burden under this steep standard of review. He suggests that McKinney's statements may have created the impression that he used force to collect drug debts or was otherwise a violent person. That's doubtful. McKinney's reference to being "afraid" was vague. He told Singleton that he stole her jewelry because he was "afraid something would happen to him if he couldn't pay [Klemis] back." His statement to Libbra was limited to a request to borrow money to pay a drug debt he owed to Klemis; nothing was said about the consequences of nonpayment. These statements were not so obviously and egregiously prejudicial that the judge should have excluded them sua sponte. Moreover, as we've noted several times,

the evidence of Klemis's guilt was overwhelming. Even if it was error to admit this testimony, it cannot plausibly be said that Klemis "probably would have been acquitted but for the erroneously admitted evidence." *Ramirez-Fuentes*, 703 F.3d at 1042 (quotation marks omitted).

## D. Juror 28

Finally, Klemis argues that he was deprived of his right to an impartial jury because Juror 28 was biased against him based on her brother's struggle with drug addiction since he was a teenager. Klemis did not move to strike Juror 28 for cause or otherwise object, so once again our review is for plain error only. *United States v. Taylor*, 777 F.3d 434, 441 (7th Cir. 2015).

> The requirement of an impartial jury is met when "the prospective juror has given final, unequivocal assurances, deemed credible by the judge, that for purposes of deciding the case, she can set aside any opinion she might hold, relinquish her prior beliefs, or lay aside her biases or her prejudicial personal experiences."

*Id.* (quoting *United States v. Allen*, 605 F.3d 461, 464–65 (7th Cir. 2010)). These conditions are satisfied here. After disclosing her brother's addiction struggle, Juror 28 gave unequivocal assurances that she could be fair.

Klemis relies on *Thompson v. Altheimer & Gray*, 248 F.3d 621 (7th Cir. 2001), but that case is not analogous. There the challenged juror was equivocal about her ability to set her bias aside: "I can't say that it's not going to cloud my judgment. I can try to be as fair as I can, as I do every day." *Id.* at

624. The judge did not follow up to clarify the ambiguity in this statement; we noted that "[h]ad the judge pushed [the juror] and had she finally given unequivocal assurances that he deemed credible, his ruling could not be disturbed." *Id.* at 626.

In contrast, Juror 28 did not equivocate. She told the court that she could be fair notwithstanding her brother's struggle with addiction. The judge accepted this assurance and seated her without objection. "This unequivocal assurance—deemed credible by the trial judge—is sufficient." *Taylor*, 777 F.3d at 441. Klemis's belated challenge cannot disturb the judge's ruling.

AFFIRMED.