In the

# United States Court of Appeals

## For the Seventh Circuit

No. 17-1270

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

DONALD S. HARDEN,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Eastern District of Wisconsin.
No. 1:16-cr-00035 — **William C. Griesbach**, *Chief Judge*.

ARGUED MAY 16, 2018 — DECIDED JUNE 20, 2018

Before FLAUM, SYKES, and HAMILTON, *Circuit Judges*.

FLAUM, *Circuit Judge*. A jury convicted defendant-appellant Donald S. Harden of conspiring to distribute heroin, the use of which resulted in the death of Fred Schnettler. Harden was sentenced to life in prison under 21 U.S.C. § 841(b)(1)(B). That provision imposes sentencing enhancements if the defendant commits a drug offense and "death or serious bodily injury results from the use of such substance." On appeal, Harden argues that the prosecution failed to present sufficient

evidence to establish beyond a reasonable doubt that his heroin caused Schnettler's death. Relatedly, Harden contends that the district court failed to adequately instruct the jury on causation. Harden also claims that the district court erred by excluding testimony about an alternative heroin source and denying his motion for a mistrial after inadmissible evidence entered the jury room. Finally, Harden maintains that the prosecution misstated evidence during closing argument. For the reasons below, we affirm.

## I. Background

At 9:39 AM on September 5, 2014, Fred Schnettler, a twenty-five-year-old male, was found dead in his bedroom at his parents' home in Neenah, Wisconsin. When the sheriff's deputy arrived on the scene, he found Schnettler's father performing CPR and observed a needle and spoon on the floor just below Schnettler's bed. The deputy believed that Schnettler had been dead for quite some time because his body was cold to the touch and rigor mortis had set in.

Donald Harden was subsequently charged with distributing the heroin that resulted in Schnettler's death. At trial, the prosecution's case focused on Schnettler's purchase of 0.1 grams of heroin from Kyle Peterson the night before Schnettler was found dead. Peterson testified that he purchased the heroin from Brandi Kniebes-Larsen, who in turn testified that she received the heroin from Harden.

At trial, the government and defense presented competing timelines regarding the heroin delivery. The government tried to establish that Harden's heroin reached Schnettler between 7:30 PM–8:00 PM on September 4, 2014 and that Schnettler overdosed on that heroin shortly after 10:00 PM. By contrast,

the defense sought to show that Schnettler received and used Harden's heroin by 5:00 PM, did not get high from it, and ultimately overdosed from heroin or morphine that he obtained from another source later in the evening. The following is a summary of the evidence presented at trial and other relevant events.

### A. Autopsy Report

Dr. Kristinza Giese, an associate medical examiner with the Fond Du Lac County Medical Examiner's office, performed an autopsy on Schnettler. She determined that his death was caused by acute heroin intoxication. Dr. Giese's opinion was based on the presence of a needle puncture mark on Schnettler's left arm, heavy lungs, cerebral edema (brain swelling), and the presence of a heroin metabolite in his urine called 6-monoacetylmorphine ("6-MAM"). Dr. Giese explained that, when injected into the bloodstream, heroin metabolizes into 6-MAM and morphine. She testified that no drug other than heroin produces 6-MAM. She further explained that 6-MAM remains in the blood for seven to forty minutes, depending on the potency of the drug, but can remain in the urine for several hours. According to the toxicology report, Schnettler's urine contained 1.2 micrograms per milliliter of 6-MAM and more than 4 micrograms of morphine. Schnettler's blood did not contain 6-MAM but did have 0.38 micrograms of morphine.

On cross-examination, Harden's counsel asked Dr. Giese whether, if someone used heroin at 5:00 and was seen to be alert at 8:00, she would expect them to die from that single dosage at 10:00. Giese responded that she "would be a little surprised" and "wouldn't expect it to be that long." She testified that she would expect someone to die "within minutes"

or "within some hours" after injecting heroin, depending on
the potency of the drug. Harden's counsel also asked Dr.
Giese whether Schnettler's toxicology report was consistent
with heroin use at 5:00 and a morphine overdose at 10:00. Dr.
Giese responded that Schnettler's blood "would have proba-
bly a higher level of morphine," but she would still expect to
see 6-MAM in the urine based on the earlier dosage of heroin.

## B. Kyle Peterson's Testimony

Peterson testified that he sold heroin to Schnettler on Sep-
tember 3 and 4, 2014. On the afternoon of September 3, 2014,
Peterson sold "a pinch," or approximately 0.1 grams of her-
oin, to Schnettler. When asked about the source of that heroin,
Peterson testified that it was not from Kniebes-Larsen, but ra-
ther "came from another friend." Peterson also noted that the
heroin "was of a different color and quality … more of a yel-
lowish color" than the heroin he sold to Schnettler on Septem-
ber 4th.

Peterson further testified that he also sold 0.1 grams of her-
oin to Schnettler on September 4th "[a]round dusk … between
7:00 and 8:00." He stated that this heroin was "dark gray in
color." When asked whether the dark gray color was signifi-
cant to him, Peterson testified that the heroin "was the same
color as" and part of the same batch that Peterson himself
overdosed on the following morning—the same morning that
Schnettler was found dead. Peterson further testified that this
heroin came from Kniebes-Larsen, whom Peterson met
through his friend Joe Rooney. Peterson said that the only her-
oin he had in his possession on September 4th was the heroin
he purchased from Kniebes-Larsen, and that he was certain
that the heroin he gave to Schnettler that day came from her.

Peterson also elaborated upon the timeline of events on September 4th. According to Peterson, he purchased 0.5 grams of heroin from Kniebes-Larsen sometime between 2:00 PM and 4:00 PM. After receiving the heroin from Kniebes-Larsen, he did not immediately deliver it to Schnettler. Instead, he waited a few hours because his "first priority" was to use the heroin himself. Peterson testified that he went to his friend Alex Shottner's ("Shotty's") house in Appleton after he received the heroin, and while there, used the heroin. Peterson stated that he spent thirty or forty minutes at Shotty's house while his friends—including his girlfriend at the time, Alesia Nettekoven—sat outside in a car. He was "pretty sure" he did not deliver the heroin to Schnettler until after he left Shotty's house. Peterson further testified that he delivered drugs to someone else, Dillon, after he left Shotty's house, and before he delivered the heroin to Schnettler. According to Peterson, he only delivered drugs to Schnettler one time on September 4th, and that delivery occurred sometime between 7:00 PM–8:00 PM, but definitely not past 8:00 PM.

On cross-examination, Peterson admitted he might have purchased the heroin from Kniebes-Larsen as late as 5:00 PM, instead of between 2:00 PM–4:00 PM as he initially testified. Harden's trial counsel questioned Peterson about his inconsistent prior statements to police. Specifically, Harden's counsel pointed out that, on September 5, Peterson told police that he purchased the heroin from Kniebes-Larsen at 5:00 PM and went immediately to Schnettler's house to deliver it before going to Shotty's house. Peterson acknowledged that he "might have told them that." Later, Harden's counsel played an audio recording of Peterson's September 5th interview with police, in which Peterson said that he went immediately to Schnettler's house to deliver the drugs before going to

Shotty's house. Harden's counsel asked Peterson whether he might be confusing his later delivery to Dillon with his earlier delivery to Schnettler, especially since he was high, but Peterson testified that he was not confusing the two deliveries.

### C. Text Message and Phone Call Log

Next, defense counsel introduced a log showing the text messages and phone calls between Peterson and Schnettler on September 4, 2014. The sequence of Schnettler and Peterson's communications were as follows:

| | |
|---|---|
| 5:09 PM | Schnettler: "It short for sure cus I thought last nights was small and this is way smaller also last nights was better" |
| 5:14 PM | Peterson: "Yeah ik a couple other ones were too, Im grabnimg more of lastnight quality as we speaj" |
| 5:15 PM | Schnettler: "Yeh dude I've almost done all of it and I'm not even high" |
| 5:21 PM | Peterson: "Oh wow. I'm sorry man. I got some thing for you bud." |
| 5:22 PM | Schnettler: "How bout drop me another one off tonight" |
| 5:24 PM | Peterson: "That's what I'm saying" |
| 5:26 PM | Schnettler: "Ima shower quick then I'll call yah" |
| 5:39 PM | Peterson: "Ight just grabbed that grey shit from lastnight so I got you" |

| 5:45 PM | Schnettler: "Can u come this way quick" |
| 5:58 PM | Peterson: "Yeah I can before I head to appleton" |
| 5:59 PM | Schnettler: "Eta" |
| 6:17 PM | [Schnettler calls Peterson] |
| 6:18 PM | [Schnettler calls Peterson] |
| 6:42 PM | [Peterson calls Schnettler] |
| 7:01 PM | Schnettler: "Were the fuck are you" |
| 7:04 PM | [Schnettler calls Peterson] |
| 7:04 PM | Schnettler: "Hello" |
| 7:09 PM | [Schnettler calls Peterson] |
| 7:38 PM | Schnettler: "U on ur way" |
| 7:39 PM | Peterson: "Yessir" |
| 7:40 PM | Schnettler: "Eta" |
| 7:41 PM | Schnettler: "?" |
| 7:42 PM | [Schnettler calls Peterson] |
| 8:40 PM | [Schnettler calls Peterson] |
| 8:53 PM | [Schnettler calls Peterson] |

After that, there are no further text messages or phone calls between Schnettler and Peterson. Between 9:00 PM and approximately 10:30 PM, Schnettler texted friends asking whether they were watching the Packers game, texted his mother, and posted on Facebook. At approximately 10:20 PM, Schnettler sent a final text message saying that he was going to bed.

Peterson agreed that these text messages suggest Schnettler received a batch of heroin from Peterson earlier in the day on September 4th and was comparing it to the September 3rd delivery. Peterson also testified that Schnettler's text messages and repeated calls toward the end of the night were consistent with "someone who was basically blowing up [his] phone trying to see when [he was] going to come for a follow-up delivery." Nevertheless, Peterson insisted that he only delivered to Schnettler once on September 4th sometime between 7:00 PM and 8:00 PM.

### D. Alesia Nettekoven's Testimony

Alesia Nettekoven testified that she was with Peterson during his deliveries to Schnettler on September 3rd and 4th. Nettekoven confirmed that after they purchased heroin from Kniebes-Larsen on September 4th, they went to Shotty's house and she waited in the car for thirty or forty minutes while Peterson was inside. Nettekoven testified that the September 4th delivery to Schnettler occurred at approximately 7:30 PM, when "[i]t was just getting dark." She further stated that she was certain that the heroin delivered to Schnettler on September 4th was from Kniebes-Larsen because they "didn't pick up from anyone else" that day.

On cross-examination, defense counsel presented Nettekoven with a text message she sent to Peterson at 7:27 PM in which she said: "Come out or we're leaving." Defense counsel also pointed to a text from Nettekoven to Peterson at 7:37 PM in which she said: "Get … outside right … now." When asked whether these texts were inconsistent with a 7:30 PM delivery to Schnettler, Nettekoven insisted that the delivery occurred when it was just getting

dark. Defense counsel then asked Nettekoven about prior inconsistent statements she made to the police on September 5, 2014. In response, Nettekoven testified that she was lying back then and admitted that she can be "a pretty convincing liar."

### E.  Brandi Kniebes-Larsen's Testimony

Kniebes-Larsen testified that she met Harden through her ex-boyfriend David Nelson. Beginning in the spring of 2014, Harden would front approximately ten grams of heroin per week to Nelson, who would then sell the heroin to others to pay Harden back. Nelson sold some of the heroin to Kniebes-Larsen, who was addicted to heroin. When Nelson moved in with Kniebes-Larsen, Harden began delivering the heroin to Kniebes-Larsen's home. Kniebes-Larsen lived with her niece, Stephanie Miller, who was also a heroin addict.

In August 2014, while Nelson was in county jail, Nelson arranged for Kniebes-Larsen to fill in for him as Harden's heroin dealer. On several occasions, Harden fronted Kniebes-Larsen with heroin to sell, but Kniebes-Larsen would often use the heroin herself rather than sell it. She testified that the heroin she received varied in color—sometimes it was "more of a charcoal gray," and other times "it was a very pale, almost beige color." For example, she testified that she purchased six grams that were "a beige-ish cream white in color" and later eleven grams that were "[a] charcoal gray with … some lighter speckles in it."

According to Kniebes-Larsen, she sold 1.5 grams of the beige heroin to Rooney on September 3 and Peterson was present for the sale. Then, on September 4, Kniebes-Larsen drove with Miller and Miller's three children from her home in

Neenah, Wisconsin to a Walgreens in Waupun, Wisconsin to purchase eleven grams of the charcoal gray heroin from Harden. Kniebes-Larsen testified that they arrived at the Walgreens at approximately 3:00 PM, but that it could have been later because they got lost on the way there. She testified that she parked a couple spots away from Harden's burgundy Chevy Suburban in the Walgreens parking lot. Miller and her children went into the Walgreens while Kniebes-Larsen got into Harden's car.

The government showed Kniebes-Larsen a surveillance photograph of the Walgreens parking lot, which Kniebes-Larsen testified was "a fair and accurate depiction" of the scene. The photograph had three different time stamps on it: 16:00, 16:04 and 17:00. Because no one authenticated the time stamps, the court only allowed the government to admit the photograph into evidence if it redacted the time stamps. The government did not do so, and the photograph was not admitted into evidence.

After the exchange, they drove back to Kniebes-Larsen's house in Neenah. During the drive back home, Kniebes-Larsen texted Rooney to make arrangements to supply him with heroin. She testified that "it was very late [but] not late at night" when they got back to Kniebes-Larsen's house. When they arrived, Kniebes-Larsen went inside and made up two syringes of the heroin she got from Harden at Walgreens—one for herself and one for Miller. Meanwhile, Miller went to go pick up Nelson's son. After injecting her shot, Kniebes-Larsen prepared a package of 1.5 grams of heroin—1 gram for Rooney and 0.5 grams for Peterson. She then drove approximately two miles to Rooney's house. Upon arriving, Rooney and Peterson got into Kniebes-Larsen's car

and she sold them the heroin. Kniebes-Larsen testified that this transaction occurred between 5:00 PM and 6:00 PM.

The government asked Kniebes-Larsen whether Harden said anything to her about the heroin at the time she received it from him. The following exchange occurred:

> Kniebes-Larsen: "Not at Walgreens. There was a time before that he had made a statement about the quality of the heroin that I was—that I had, that [indiscernible]."
>
> Prosecutor: "And in this earlier statement to you about the quality of the heroin he was providing to you, what was his statement?"
>
> Kniebes-Larsen: "That I needed to be very careful because apparently there were bodies on this heroin."

After Schnettler was found dead, Kniebes-Larsen was arrested. At the police station, Kniebes-Larsen swallowed 1.5 grams of the heroin she received from Harden at Walgreens. Kniebes-Larsen said the heroin was not potent to her and that she had previously described it as "junk." She spoke with police detectives, but she testified that the interview was "a little fuzzy" because she was "dope sick" and "starting to go through heroin withdrawals." She told detectives that the transaction with Rooney and Peterson occurred "after 5:00 sometime."

Kniebes-Larsen pled guilty to conspiracy to distribute more than 100 grams of heroin and agreed to cooperate with the government and testify against Harden. In exchange, the government agreed that she would not be charged with causing Schnettler's death.

### F.  Controlled Buy From Harden

Nelson was taken into custody at the same time as Kniebes-Larsen on September 5, 2014. He agreed to become a confidential informant and to make controlled buys from Harden. At trial, the government played an audio recording of a phone call Nelson made to Harden on September 10, 2014 to arrange payment of Kniebes-Larsen's drug debt and to set up a controlled buy. Nelson eventually purchased heroin from Harden and gave the drugs to the Winnebago County Sheriff's Department.

### G.  Harden's Arrest

On September 15, 2014, Winnebago County authorities searched the Watertown apartment Harden used as his stash house. They found three packages of heroin, a digital scale, and other drugs. Around the same time as the search, Harden was arrested during a traffic stop.

### H.  Jury Instructions

Harden was charged with conspiracy to distribute controlled substances in violation of 21 U.S.C. § 841(a)(1). The jury instructions included two special verdict questions: (1) "whether the United States has established, beyond a reasonable doubt, that Frederick J. Schnettler died as a result of the use of a controlled substance, to wit: heroin, distributed by the defendant"; and (2) "whether the conspiracy involved

100 grams or more of a mixture and substance containing heroin."

With respect to the first special verdict question, the jury instructions said:

> The United States does not have the burden of establishing that the defendant intended that death resulted from the distribution or the use of the controlled substance. Nor does the United States have the burden of establishing that the defendant knew, or should have known, that death would result from the distribution of the controlled substance by the defendant.

## I. Testimony About Alternative Heroin Source

Defense counsel sought to have Schnettler's friend and former roommate testify that: (1) four strangers came to their apartment a month prior to Schnettler's death; and (2) shortly thereafter he witnessed Schnettler experience a non-fatal drug overdose in the shower. During a pretrial motion *in limine* hearing, defense counsel explained that this testimony was relevant "to present potential other sources of drugs other than what the Government's presenting in its case in chief." At that time, the district judge stated that "the fact that [Schnettler] had this alternative source" was relevant to Harden's defense, but that the overdose did not seem to be relevant and might even be prejudicial. The district judge excluded the testimony, but said it could be introduced at trial if defense counsel provided a reason why the prior overdose was relevant.

On the second day of trial, the district court revisited the issue. Defense counsel explained that the sole basis for the

Schnettler's friend's belief that Schnettler had overdosed on heroin was the fact that he found Schnettler collapsed in the shower with a hypodermic needle next to him. Because the incident occurred a month before Schnettler's death and the witness was not qualified to make a judgment about a heroin overdose, the government argued that the testimony was "misleading" and "irrelevant." Again, the court reiterated that evidence of alternative sources of heroin was relevant, "even [if] the timeliness makes it less relevant."

Later during the trial, Harden's defense counsel clarified that, in fact, the witness had not seen a hypodermic needle in the shower. The court subsequently ruled that, without evidence that the collapse was related to drug use, testimony about the incident was not relevant.

Defense counsel then sought to have the same witness "testify that Fred had spoken to him about a source he had" for heroin in Milwaukee. The government objected that the statement was hearsay. In response, defense counsel argued that it satisfied the exception for statements against interest because Schnettler was unavailable and the statement was reliable, as Schnettler's "best friend" would "have no reason to be lying." The district court excluded the testimony on relevance grounds and because it did not satisfy an exception to the hearsay rule.

### J.  Motion for Mistrial

Approximately two hours after the jury began its deliberations, it was discovered that Exhibit 8—the Walgreens surveillance photo with the unauthenticated time stamps—had been sent into the jury room. When the court clerk went to

retrieve the photo, a juror asked the clerk why the court wanted it back. The clerk said: "I can't comment on that."

Harden moved for a mistrial, but the motion was denied. The district judge questioned whether the photograph was material, noting that it was "a little bit in the weeds" and that he was "not sure that it carries anywhere near the weight [Harden's counsel] place[d] on it."

About an hour and a half later, the jury sent the court the following question: "Can we factor in other possibilities not presented?" Harden's trial counsel said: "I think the clear answer is yes." The court told the parties it was inclined to answer the jury's question in the affirmative and point them to Pattern Instruction 2.02, which allows jurors to use their common sense in weighing the evidence and make reasonable inferences based on the evidence. The court then asked Harden's trial counsel whether he had any objection. Harden's trial counsel agreed that such an instruction "would be appropriate."

### K.  Conviction and Sentencing

The jury convicted Harden of conspiracy to distribute 100 grams or more of heroin, resulting in death, pursuant to 21 U.S.C. §§ 841(a)(1), 841(b)(1)(B) and 846. Because of the "death results" enhancement in § 841(b), Harden was sentenced to life in prison.

## II. Discussion

On appeal, Harden argues that: (1) the evidence presented at trial was insufficient to prove that the heroin he distributed caused Schnettler's death; (2) the district court failed to adequately instruct the jury on but-for and proximate causation; (3) the district court erred by excluding Schnettler's friend's

testimony regarding an alternative source of heroin; (4) the district court abused its discretion by denying Harden's motion for a mistrial; and (5) the prosecution misstated evidence during closing argument, necessitating a new trial.

## A. There Was Sufficient Evidence Regarding Causation

"When reviewing a challenge to the sufficiency of the evidence, 'we view the evidence in the light most favorable to the prosecution and ask whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *United States v. Moshiri*, 858 F.3d 1077, 1081 (7th Cir. 2017) (quoting *United States v. Salinas*, 763 F.3d 869, 877 (7th Cir. 2014)). "We do not reweigh the evidence nor judge the credibility of witnesses." *Id.* at 1082. "If there is a reasonable basis in the record for the verdict, it must stand." *Id.* To the extent such a challenge raises questions of law, we review them de novo. *See United States v. Stott*, 245 F.3d 890, 904 (7th Cir. 2001).

In this case, the government was required to prove beyond a reasonable doubt that: (1) Harden conspired to distribute 100 grams or more of heroin; and (2) "death or serious bodily injury result[ed] from the use of such substance." 21 U.S.C. § 841(b)(1)(B); *see Burrage v. United States*, 134 S. Ct. 881, 887 (2014) (noting that the "death results" enhancement of § 841 "is an element that must be submitted to the jury and found beyond a reasonable doubt"). Harden does not dispute that the government presented sufficient evidence to convict him of the first element. Instead, his challenge focuses solely on the "death results" enhancement. Specifically, Harden argues that the government did not present sufficient evidence at trial to prove beyond a reasonable doubt that the heroin he

distributed was the but-for and proximate cause of Schnettler's death.

### 1. But-For Causation

In *Burrage*, the Supreme Court interpreted the phrase "results from" in § 841(b) to require "but-for causation"—i.e., that the death would not have occurred but for the defendant's drug-dealing. 134 S. Ct. at 887–89. In that case, the victim died of "mixed drug intoxication" after using several different kinds of drugs, including heroin that he purchased from the defendant. *Id.* at 885–86. Medical experts concluded that heroin was a "contributing factor" in the victim's death because it "interacted with the other drugs to cause 'respiratory and/or central nervous system depression.'" *Id.* at 885. However, the experts could not say whether the victim would have lived had he not taken the heroin. *Id.* at 886. The district court gave a jury instruction requiring the government to prove that the heroin distributed by the defendant was a "contributing cause" of the death, and the defendant was convicted. *Id.* The Supreme Court held that, "at least where use of the drug distributed by the defendant is not an independently sufficient cause of the victim's death …, a defendant cannot be liable under the penalty enhancement provision of 21 U.S.C. § 841(b)(1)(C) unless such use is a but-for cause of the death." *Id.* at 892. The Court reasoned that this but-for causation requirement is consistent with the "ordinary meaning" of the phrase "results from" and is "one of the traditional background principles 'against which Congress legislate[s].'" *Id.* at 887, 889 (alteration in original) (quoting *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 347 (2013)).

Here, the government presented sufficient evidence for a rational trier of fact to conclude beyond a reasonable doubt

that the heroin distributed by Harden was the but-for cause of Schnettler's death. First, unlike *Burrage*, this is not a mixed toxicity case. Rather, Dr. Giese opined that Schnettler died from acute heroin intoxication. And, although Harden questions whether the heroin was potent enough to kill Schnettler, Peterson testified that he overdosed on the same heroin the following morning, which suggests that it was.

In addition, the prosecution presented testimony from several witnesses to establish the source of the heroin that caused Schnettler's death. Kniebes-Larsen testified that Harden was her sole source of heroin. Peterson also testified that the only heroin he had in his possession on September 4th was the heroin he purchased from Kniebes-Larsen, and that he was certain that the heroin he gave to Schnettler that day was the same heroin he received from Kniebes-Larsen. Likewise, Nettekoven testified that she was certain that the heroin delivered to Schnettler on September 4th was from Kniebes-Larsen because they "didn't pick up from anyone else" on that day.

The government's timeline evidence further suggests that Harden's heroin caused Schnettler's death. Kniebes-Larsen testified that Harden gave her charcoal gray heroin on the afternoon of September 4th, which she sold to Rooney and Peterson between 5:00 PM and 6:00 PM. In turn, Peterson testified that he delivered Harden's heroin to Schnettler between approximately 7:00 PM and 8:00 PM. Nettekoven similarly testified that it was approximately 7:30 PM and "just getting dark." Schnettler's frantic texts and phone calls to Peterson between 5:59 PM and 7:38 PM arguably point to a similar delivery time. For example, at 7:38 PM, Schnettler texted to ask Peterson whether he was on his way. At 7:39 PM, Peterson responded:

"Yessir." At 7:40 PM, Schnettler texted Peterson to ask for his "Eta." Because this was the final text message between Schnettler and Peterson, one could reasonably infer that Peterson delivered the heroin to Schnettler around that time. If Schnettler received Harden's heroin around 8:00 PM, an overdose sometime after 10:30 PM is entirely consistent with Dr. Giese's testimony that someone could die "within some hours" after injecting heroin. In light of this evidence, a jury could conclude beyond a reasonable doubt that the heroin distributed by Harden was the but-for cause of Schnettler's death.

Admittedly, a rational trier of fact could have reached the opposite conclusion. In particular, one could infer from the text messages and phone calls between Schnettler and Peterson that: (1) Peterson delivered heroin to Schnettler on September 4th at or before 5:00 PM; (2) Schnettler had used most of the heroin by shortly after 5:00 PM and was not high because the heroin was of poor quality; (3) Peterson was planning to do a follow-up delivery of Harden's gray heroin to Schnettler later that night; and (4) Peterson never made the promised follow-up delivery. Indeed, during his cross-examination, Peterson admitted that Schnettler's repeated calls during the 8:00 PM hour were consistent with "someone who was basically blowing up [his] phone trying to see when [he was] going to come for a follow-up delivery." If Schnettler had used almost all of Harden's heroin by 5:00 PM and never received a second delivery later that night, Dr. Giese testified that she "would be a little surprised" if Schnettler died from that single dosage at 10:00 PM. In addition, there is at least some evidence that Harden's heroin was not potent enough to kill Schnettler. For example, Peterson says that he only delivered 0.1 grams to Schnettler on September 4th, and

Kniebes-Larsen testified that she ingested 1.5 grams of the same heroin on September 5th on the way to the police station with no ill effect. Finally, Harden's trial counsel severely undermined the credibility of the government's key witnesses—namely Peterson and Nettekoven—on cross-examination.

Nevertheless, our task at this stage is not to "reweigh the evidence" or "judge the credibility of witnesses." *Moshiri*, 858 F.3d at 1082. Rather, we must "view the evidence in the light most favorable to the prosecution." *Id.* at 1081 (quoting *Salinas*, 763 F.3d at 877). When viewed in that light, a finding of but-for causation has a reasonable basis in the record.

### 2. *Proximate Causation*

Harden argues that the "death results" enhancement in § 841(b) also requires proof of proximate causation—i.e., that Schnettler's death was a reasonably foreseeable result of Harden's drug dealing.

However, every federal court of appeals to address this issue has reached the opposite conclusion. *See United States v. Burkholder*, 816 F.3d 607, 618 (10th Cir. 2016); *United States v. Webb*, 655 F.3d 1238, 1250 (11th Cir. 2011); *United States v. De La Cruz*, 514 F.3d 121, 137 (1st Cir. 2008); *United States v. Houston*, 406 F.3d 1121, 1124–25 (9th Cir. 2005); *United States v. Carbajal*, 290 F.3d 277, 284 (5th Cir. 2002); *United States v. McIntosh*, 236 F.3d 968, 972 (8th Cir. 2001), *abrogated on other grounds by Burrage*, 134 S. Ct. 881; *United States v. Robinson*, 167 F.3d 824, 832 (3d Cir. 1999); *United States v. Patterson*, 38 F.3d 139, 145 (4th Cir. 1994).

Although we have not yet squarely decided the issue,[1] we find our sister circuits' holdings persuasive for two reasons. First, the statutory language does not require proof of proximate cause. *See* 21 U.S.C. § 841(b). Again, the sentencing enhancement is triggered if "death or serious bodily injury *results from* the use of such substance." *Id.* (emphasis added). The use of the phrase "results from" is "noteworthy" because "[r]esulting in death and causing death are not equivalents." *Burkholder*, 816 F.3d at 614 (alteration in original) (internal quotation marks omitted). A statute that uses the word "cause" is more readily understood to incorporate the common law requirement of proximate cause, but a statute that uses the term "results from" does not carry the same implication. *See id.* The absence of proximate-cause language in § 841(b) is especially "telling" because there are "numerous instances in which Congress explicitly included proximate-cause language in statutory penalty enhancements." *Id.* at 615 (citing other statutory provisions); *see also Patterson*, 38 F.3d at 145 n.7 (citing 21 U.S.C. § 848(m)(4)). Therefore, "Congress clearly knew how to add a proximate-cause requirement in criminal penalty-enhancement statutes when it wished to do so." *Burkholder*, 816 F.3d at 615.

Second, due to the extremely hazardous nature of drug distribution, a policy of strict liability when death occurs fits

---

[1] We discussed this issue—and seemed to agree with the majority of circuits—in *United States v. Hatfield*, 591 F.3d 945, 950 (7th Cir. 2010). However, the dispositive question in that case was whether a trial court should further define the phrase "results from" for the jury. *Id.* at 947. Moreover, the defendants in that case "[did] not challenge the interpretation of the statute as imposing strict liability on them for death or injury to recipients of their drugs." *Id.* at 951. Therefore, *Hatfield*'s discussion of proximate cause was dicta.

the statutory language and its evident purpose. Just as tort law imposes strict liability when inherently dangerous activities result in negative consequences, this criminal statute treats death as categorically foreseeable, regardless of whether this particular defendant foresaw or should have foreseen such a result.

Harden argues that the other circuits' precedents are no longer good law after the Supreme Court's decision in *Burrage*. We disagree. Although the *Burrage* Court granted certiorari on the proximate cause question, the Court did not reach that issue because it reversed the defendant's conviction on the ground that the government had not established but-for causation. 134 S. Ct. at 892. Indeed, the Court "expressly declined to decide whether the phrase ['results from'] also embodies a proximate-cause requirement." *Burkholder*, 816 F.3d at 618–19 (citing *Burrage,* 134 S. Ct. at 887). Moreover, even after *Burrage*, two federal courts of appeals have held that there is no requirement to prove proximate cause. *See United States v. Alvarado*, 816 F.3d 242, 249 (4th Cir. 2016) (holding that the Fourth Circuit's pre-*Burrage* precedent "remains good law on this issue"); *Burkholder*, 816 F.3d at 618–19 (addressing the issue as a matter of first impression). In short, "*Burrage* does not answer the question we face in this appeal—let alone resolve it in [Harden's] favor." *Burkholder*, 816 F.3d at 619. Rather, *Burrage* left the unanimous holdings from federal courts of appeals on this issue intact.

In any event, our pre-*Burrage* precedent is consistent with the common law principles that the Supreme Court reiterated in *Burrage*. The *Burrage* Court said that, "[w]hen a crime requires 'not merely conduct but also a specified result of conduct,' a defendant generally may not be convicted unless his

conduct is 'both (1) the actual cause, and (2) the "legal" cause (often cause the "proximate cause") of the result.'" 134 S. Ct. at 887 (quoting 1 W. LaFave, Substantive Criminal Law § 6.4(a), at 464–66 (2d ed. 2003)). Although Congress legislates with this background common law principle in mind, it may abrogate it by "'speak[ing] directly' to the question addressed by the common law." *United States v. Texas*, 507 U.S. 529, 534 (1993) (quoting *Mobil Oil Corp. v. Higginbotham*, 436 U.S. 618, 625 (1978)). Thus, if "a statutory purpose to the contrary is evident," the default common law principles do not apply. *Id.* (quoting *Astoria Fed. Sav. & Loan Ass'n v. Solimino*, 501 U.S. 104, 108 (1991)). Here, as the Tenth Circuit held post-*Burrage*, "Congress has unambiguously expressed a desire to deviate from background common-law principles, [and] we must give effect to this intent." *Burkholder*, 816 F.3d at 621.

Additionally, Harden argues that principles of co-conspirator liability compel a proximate cause requirement in this context. In *Pinkerton v. United States*, the Supreme Court held that a defendant may only be held liable for a co-conspirator's criminal act if it was reasonably foreseeable. 328 U.S. 640, 647–48 (1946). Thus, when a defendant is charged with conspiracy to distribute narcotics, the district court must sentence him commensurate with: (1) the quantity of drugs he was "personally responsible for," and (2) the quantity of drugs dealt by co-conspirators to the extent it was reasonably foreseeable. *United States v. Cruse*, 805 F.3d 795, 817 (7th Cir. 2015). However, in this case Harden does not claim that he was sentenced based on a co-conspirator's unforeseeable criminal act. Instead, he contends that the *consequence* of his *own* criminal act—Schnettler's death—was not reasonably foreseeable. Therefore, the issue presented simply does not implicate *Pinkerton*'s limitations on co-conspirator liability.

In sum, the "death results" enhancement in § 841(b) does not require proof that the death was reasonably foreseeable. As a result, we need not address whether the government presented sufficient evidence of proximate cause.

### B. Harden Waived his Challenge to the Jury Instructions

Next, Harden argues that the district court erred by failing to properly instruct the jury regarding but-for and proximate causation. However, Harden waived this argument by approving the jury instruction in the district court.

"We have repeatedly held that approval of a jury instruction in the district court extinguishes any right to appellate review of the instruction." *United States v. Johnson*, 874 F.3d 990, 1000 (7th Cir. 2017) (quoting *United States v. Trudeau*, 812 F.3d 578, 589 (7th Cir. 2016)). At the same time, we have hesitated to infer intentional waiver where "defense counsel approves jury instructions in a 'rote call-and-response colloquy with the district judge'" or gives "blanket approvals" for the jury instructions as a whole. *Id.* (quoting *United States v. Natale*, 719 F.3d 719, 731 (7th Cir. 2013)).

Here, Harden approved the specific causation instruction that he now challenges on appeal. On the second day of trial, the district judge asked whether defense counsel had reviewed the jury instructions and whether those instructions "look[ed] reasonable." Defense counsel responded that he "reviewed them and they seemed reasonable" and that he "[didn't] have a particular battle over anything." The following morning, the district judge asked the parties whether they had a chance to review the verdict form. The government replied, "there's one change that probably needs to be made and

that's did the death of Frederick J. Schnettler result from his use of heroin, I think that probably needs to be tied to Mr. Harden somehow." The court agreed, and proposed the following language regarding causation for the verdict form: "Did the death of Frederick Schnettler result from the use of heroin provided by the Defendant, Donald S. Harden?" The district judge asked both parties whether that change would be "satisfactory," and Harden's counsel responded in the affirmative, "[p]rovided … what you're going to be reading says 'distributed' by Donald S. Harden." Shortly thereafter, the district judge asked whether "[a]nything else … needs to be changed or any additional instructions … are necessary." Harden's counsel responded in the negative. Thus, Harden clearly waived his challenge to the jury instruction regarding causation.

### C. The District Court Did Not Abuse its Discretion by Excluding Testimony About an Alternative Heroin Source

Harden next contends that the district court erred by excluding testimony from Schnettler's friend that Schnettler told him he had another heroin source in Milwaukee. We generally review evidentiary errors for an abuse of discretion. *United States v. Phillips*, 596 F.3d 414, 416 (7th Cir. 2010). "[W]e find an abuse of discretion only when no reasonable person could agree with the district court." *Jenkins v. Chrysler Motors Corp.*, 316 F.3d 663, 664 (7th Cir. 2002).[2]

---

[2] Contrary to the government's assertion, Harden's offer of proof was adequate under Federal Rule of Evidence 103(a)(2). "[A]n offer of proof generally should state a ground for admissibility, inform the court and opposing counsel what the proponent expected to prove by the excluded evidence and demonstrate the significance of the excluded testimony." *United*

The district court offered two rationales for excluding the friend's testimony. First, the district court said that the relevance of this statement was "so low" as to render it inadmissible. The court reasoned that addicts frequently have other sources of heroin and "no one is claiming that Mr. Harden is the only source of heroin in the Appleton area or in Wisconsin." Second, the district court ruled that Schnettler's alleged statement was hearsay and did not satisfy the hearsay exception for statements against interest because it was made to his friend, not a police officer.

Even assuming the proffered testimony satisfied the statement against interest exception, the court did not abuse its discretion by excluding the testimony. "Rule 401 defines relevant evidence as evidence having 'any tendency to make a fact more or less probable than it would be without the evidence' and where 'the fact is of consequence in determining the action.'" *United States v. Boros*, 668 F.3d 901, 907 (7th Cir. 2012) (quoting Fed. R. Evid. 401). This is a "low threshold." *Tennard v. Dretke*, 542 U.S. 274, 285 (2004). Thus, even testimony that has "only minimal relevance" satisfies Rule 401. *Boros*, 668 F.3d at 907. Here, by stating that the relevance of the proffered statement was "so low," the district court implicitly

---

*States v. Peak*, 856 F.2d 825, 832 (7th Cir. 1988). Here, Harden's offer of proof described both the substance of the proposed testimony (that Schnettler told his friend that he had an alternative heroin source in Milwaukee) and the grounds for its admissibility (the hearsay exception for statements against interest). Given the district court's prior discussions regarding this witness's testimony during the motion *in limine* hearing and the second day of trial, the significance of the proffered testimony was apparent to both the court and the government.

acknowledged that it had at least *some*, albeit limited, relevance to Harden's defense.

However, by holding that the proffered statement was nevertheless inadmissible, the court was presumably relying on Rule 403. Even if testimony is relevant under Rule 401, a district court may "exclude relevant evidence if its probative value is substantially outweighed by a danger of … unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting of time, or needlessly presenting cumulative evidence." *Id.* at 909 (alteration in original) (quoting Fed. R. Evid. 403). Although the district court did not explicitly cite these concerns, "[w]e may affirm on any ground supported by the record." *Boyd v. Ill. State Police*, 384 F.3d 888, 897 (7th Cir. 2004). Because the district judge had just ruled to exclude testimony regarding the shower incident, Schnettler's friend would now *only* be testifying that Schnettler told him at some unspecified point in time that he had a heroin source in Milwaukee. The district judge could have reasonably concluded that the low probative value of this statement was substantially outweighed by a danger of confusing the jury and wasting time. Accordingly, the district court did not abuse its discretion by excluding it.

Moreover, assuming arguendo that the district court abused its discretion, we will not reverse the evidentiary ruling if the error was harmless. A court's erroneous exclusion of evidence is harmless "[o]nly if we are convinced that the error did not influence the jury or had a very slight effect, and can so say with fair assurance." *United States v. Nagib*, 56 F.3d 798, 805 (7th Cir. 1995) (alteration in original) (quoting *United States v. Zapata*, 871 F.2d 616, 622 (7th Cir. 1989), *abrogated on other grounds by United States v. Gomez*, 763 F.3d 845 (7th Cir.

2014)). Here, the admission of the excluded testimony would have had only a very slight effect, if any, on the jury. We do not know when Schnettler told his friend that he had an unidentified heroin source in Milwaukee. Absent additional evidence that Schnettler had purchased heroin from that source in the days leading up to his death, the statement had very little probative value. On the other side of the scale, the prosecution presented significant evidence from which the jury could reasonably infer that Harden's heroin caused Schnettler's death.

### D. The District Court Did Not Abuse its Discretion by Denying Harden's Motion for a Mistrial

Next, Harden maintains that the district court erred by denying his motion for a mistrial with respect to the Walgreens surveillance photograph that was improperly given to the jury during deliberations.

"[J]ury consideration of facts not introduced in evidence denies a defendant's Sixth Amendment rights to confrontation, cross-examination and assistance of counsel with respect to the extraneous evidence." *United States v. Bruscino*, 662 F.2d 450, 458 (7th Cir. 1981). However, "a new trial is not automatically required whenever a jury is exposed to material not properly in evidence." *United States v. Sababu*, 891 F.2d 1308, 1333 (7th Cir. 1989). Rather, "[a] defendant is only entitled to a new trial if there is a reasonable possibility that the evidence had a prejudicial effect upon the jury's verdict." *United States v. Berry*, 92 F.3d 597, 600 (7th Cir. 1996). This inquiry is highly fact-specific, and "[t]he district court judge is always in a better position than appellate judges to assess the probable reactions of jurors in a case over which that district judge has presided." *United States v. Van Eyl*, 468 F.3d 428, 436 (7th Cir.

2006). For that reason, "[w]e review a denial of a mistrial for an abuse of discretion with an extra helping of deference." *United States v. Lawrence*, 788 F.3d 234, 243 (7th Cir. 2015). We "'must affirm unless we have a strong conviction that the district court erred,' and the error committed was not harmless." *Id.* (quoting *United States v. Vargas*, 689 F.3d 867, 873 (7th Cir. 2012)).

Here, the district court did not abuse its discretion by denying Harden's motion for a mistrial based on the jury's exposure to the Walgreens surveillance photograph. The district judge questioned whether the photograph played any role in the jury's deliberations and said "[his] own view is this is a little bit in the weeds." The court pointed out that the photograph had three different time stamps (16:00, 16:04, and 17:00) and no date. As a result, it was unclear whether jurors would recognize the import of the photograph with respect to the competing timelines presented at trial. Moreover, the photograph does not even show that the parking lot is outside of a Walgreens, so the jury might not have connected the photograph to Kniebes-Larsen's testimony about the Waupun exchange. In addition, even assuming the jury relied on the latest time stamp of 17:00, the district judge was "not sure that it carrie[d] anywhere near the weight [defense counsel] place[d] on it." The district judge was in the best position to assess the potential prejudice of the photograph. Because his ruling was reasonable and we are not left with a strong conviction of error, we must affirm.[3]

---

[3] To the extent Harden argues that the district court erroneously answered the jury's subsequent question about whether it could factor in other possibilities, that argument is waived. Defense counsel explicitly approved the court's response to the jury's question, stating "the clear answer is yes."

### E.  The Prosecution's Misstatements of Evidence During Closing Argument Do Not Warrant Reversal

Lastly, Harden argues that the prosecution misstated two pieces of evidence during closing argument, necessitating a new trial.

"Misstatements of evidence during closing argument can be improper, but it is rarely reversible error." *United States v. Mullins*, 800 F.3d 866, 872 (7th Cir. 2015) (citations omitted). To determine whether a prosecutor's misstatement of evidence requires reversal, we consider: "(1) the nature and seriousness of the alleged misconduct; (2) whether the defense invited the prosecutor's statements; (3) whether the jury instructions adequately addressed the matter; (4) whether the defense had an opportunity to respond to the improper remarks; and (5) the weight of the evidence against the defendant." *United States v. Klemis*, 859 F.3d 436, 442 (7th Cir. 2017). Because Harden did not object to either of these statements in the district court, we review for plain error. *See id.* at 441. Under that standard, "[r]eversal is warranted only if we find an obvious (i.e., 'plain') error that affected the outcome of the trial and seriously affected the fairness, integrity, or public reputation of the judicial proceedings." *Id.* "The challenged remarks cannot be plain error unless [the defendant] probably would have been acquitted if the prosecutor had not made them." *Id.*

---

After the court proposed answering in the affirmative and referring the jury to Pattern Instruction 2.02, defense counsel said that "would be appropriate." In doing so, he waived any challenge to the court's response to the jury question.

Neither alleged misstatement warrants reversal in this case. Here is the prosecution's first alleged misstatement in its entirety:

> You also should recall that [Kniebes-Larsen] testified when she was given this heroin by Mr. Harden–and this is important when you read the jury instructions, is you need to look at what the Defendant said to others and what his actions were. But he was especially callous when he told Ms. Kniebes-Larsen, again paraphrasing, be careful, this shit has overdoses. So he knew this was going on, at least according to Ms. Kniebes-Larsen's testimony. But was that a warning to her to say, hey, cool it? Did he–he still gave it to her. She still gave it to other people because that's how it works right? You need to make the money, you need to use your stuff, you need to keep this conspiracy and this business going. And unfortunately no one hesitated to say, there's overdoses on this, why are we continuing to distribute it down the chain, ultimately ending up with Fred Schnettler.

Harden claims that this misstates the evidence because Kniebes-Larsen testified that Harden warned her that a *previous* batch of heroin had "bodies on" it, not the batch of heroin she received on September 4, 2014.

The relevant factors weigh against reversal. First, the alleged misconduct was not serious. Indeed, it is unclear whether the prosecutor's statement even misconstrues Kniebes-Larsen's testimony. Harden narrowly interprets the prosecutor's statement to refer only to the September 4, 2014

batch. However, the statement can also be seen as generally calling the jury's attention to Harden's callousness by pointing out that Harden continued to distribute heroin even after he warned Kniebes-Larsen that it had caused overdoses. Second, the court instructed the jury that "[t]he lawyer's statements and arguments are not evidence. If what a lawyer said is different from the evidence as you remember it, the evidence is what counts." This curative jury instruction further weighs against reversal. Third, because this alleged misstatement was made during the prosecution's main closing argument, Harden's defense counsel had an opportunity to respond to it in his own closing argument but did not. Finally, the prosecution was not required to prove that Schnettler's death was reasonably foreseeable, so the statement would not have affected the outcome of the trial. Given the weight of the evidence against Harden, we cannot conclude that Harden probably would have been acquitted absent the alleged misstatement.

Harden also claims that the prosecutor misstated evidence when he told the jury that Harden distributed the heroin Schnettler received on September 3 and 4, 2014. Specifically, the prosecutor said: "If there's delivery on the 3rd and there's delivery on the 4th, and it's all coming from Mr. Harden through those individuals, why does it matter what time it took place?" The government concedes that this statement conflicted with Peterson's testimony that the heroin he gave Schnettler on September 3rd came from a different source. Again, though, the relevant factors counsel against reversal. First, the misstatement was not serious and certainly would not have affected the outcome of the trial. The government's case focused on Peterson's delivery of Harden's heroin to Schnettler on September 4th, and the defense never suggested

that Schnettler overdosed on the September 3rd heroin. Instead, the defense claimed that Schnettler died as a result of heroin or morphine he obtained later in the evening on the 4th. Because all of the critical events occurred on September 4, 2014, the prosecution's misstatement regarding the source of the September 3rd delivery was insignificant. Admittedly, the defense did not have an opportunity to respond to this misstatement, which was made during the prosecution's rebuttal closing argument. Nevertheless, the curative jury instruction mitigates any prejudice and weighs against reversal. So, too, does the vast weight of the evidence that Harden's heroin caused Schnettler's death.

## III. Conclusion

For the foregoing reasons, we AFFIRM the judgment of the district court.